**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**

_____

No. 92-4580
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

ANDY RESTREPO and
GUSTAVO BEDOYA NARANJO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Eastern District of Texas
_____
(June 17, 1993)

Before JOLLY and DAVIS, Circuit Judges, BRAMLETTE[1], District Judge.

BRAMLETTE, District Judge:

Defendants-appellants Andy Restrepo and Gustavo Bedoya Naranjo appeal their convictions, following a joint jury trial, on charges that they conspired to possess more than five kilograms of cocaine with the intent to distribute it, in violation of 21 U.S.C. § 846, and on individual charges of possession of more than five kilograms of cocaine with the intent to distribute it, and actual distribution of more than five kilograms of cocaine, all in violation of 21 U.S.C. § 841.

Defendant Andy Restrepo (Restrepo) was found guilty of the conspiracy charge (count 1), one individual count of possession

_____

[1] District Judge of the Southern District of Mississippi, sitting by designation.

with intent to distribute and actual distribution (count 5), and one individual count of possession with intent to distribute (count 6). Defendant Gustavo Bedoya Naranjo (Naranjo) was found guilty of the conspiracy charge (count 1), four individual counts of possession with intent to distribute and actual distribution (counts 2-5), and one individual count of possession with intent to distribute (count 6).[2] Finding no reversible error as to any of the issues raised on appeal, we affirm both defendants' convictions.

## I.
## FACTS

The conspiracy with which the defendants were charged was alleged to have taken place from approximately 1981 until 1991 (count 1). The individual counts in the indictment were alleged to have taken place in the spring of 1987 (count 2), March of 1989 (count 3), June of 1990 (count 4), June of 1991 (count 5), and November of 1991 (count 6).

At trial, the government's evidence showed the following:

### A. The Beginnings of the Conspiracy

J.C. Lanier and John Thomas Johnson, co-traffickers in marijuana, were introduced to the defendant Naranjo in east Texas sometime in the early 1980's. Lanier met Naranjo first, for the

---

[2] The defendants were also charged with a count of criminal forfeiture (count 7) pursuant to 21 U.S.C. § 853. The forfeiture count was severed by the district court and tried separately. Neither defendant contested the forfeiture order entered by the district court.

purpose of purchasing cocaine from him.  Lanier then introduced Johnson to Naranjo, and Johnson also began purchasing cocaine from Naranjo.

In approximately 1983 or 1984, Naranjo introduced Johnson to his brother, German Naranjo, a resident of Miami, Florida.  Johnson and German Naranjo then went to Dallas to obtain cocaine which had been shipped there at the direction of German Naranjo.  Johnson and Lanier then attempted to sell the cocaine.  The defendant Naranjo did not participate in this transaction, but there was testimony that he had knowledge of it.

Johnson testified that in 1984 Naranjo introduced him to someone named "Ney," who had come to east Texas from Miami with a kilogram of cocaine.  Johnson stated that he and Naranjo tried to sell the entire kilogram.  They sold part of it and returned the unsold balance to Ney.

In 1985, Johnson stopped trafficking in cocaine and limited his illicit drug activity to marijuana.  That year, Johnson and Naranjo established a corporation for the purpose of importing lumber from a mill owned by Naranjo's father in Columbia.  The first shipment of lumber arrived in 1986, before the partners rented a warehouse.  The shipment was stored in a shed adjacent to Johnson's residence until it was sold.

**B.  Count 2**

Johnson and Naranjo then rented a warehouse in Longview, Texas.  A second shipment of lumber arrived, in a large container, transported to the warehouse by truck from Houston.  Johnson

3

testified that he was not present when the container arrived, but that he was told by Naranjo that the container had a false wall, and that 700 to 800 kilograms of cocaine had been secreted in boxes between the false wall and the actual side of the container of lumber. Johnson testified that two weeks later, Naranjo gave him $100,000 in cash for being part of the smuggling operation, and that Naranjo told him he had received an equal amount of money.

Two or three months later, another container of lumber arrived from abroad and was stored at the warehouse. According to Johnson, a crew from Miami, supervised by an individual named "Henry," arrived at the warehouse to remove the false wall. They pulled off the front wall of the container, revealing a compartment containing a number of boxes. Members of the work crew and Naranjo told Johnson that the boxes contained 700-800 kilograms of cocaine. The boxes were transferred to a truck by the crew and driven away. Johnson testified that he again received $100,000, and that Naranjo told him that he and Henry had been paid an equal amount of money.

After another two or three months, another container arrived at the warehouse. The same work crew returned, opened the false compartment, and transferred the boxes from the compartment to their truck. Naranjo told Johnson again that the boxes contained 700-800 kilograms of cocaine. He paid Johnson $50,000, keeping an equal amount of money for himself. Naranjo and Johnson subsequently closed their lumber import business.

## C.  Count 3

Johnson testified that he met a man named "Roberto" during his

lumber import venture with Naranjo, and that in 1988 he and Naranjo obtained cocaine from Roberto in Houston and sold it on consignment. Later in 1988, at Roberto's home, Naranjo revealed plans to fly cocaine to east Texas from Tampico, Mexico. A crew was assembled to off-load the cocaine. One of the crewmen was William Brooks, one of Johnson's former marijuana customers.

In preparation for the venture Brooks purchased a motorhome with funds furnished by Johnson. In early 1989 the airplane landed on a farm-to-market road and stopped at a wheat field. The off-loading crew removed the plastic sacks containing cocaine from the plane and transferred them to a pickup truck, which was driven to a nearby ranch. The next day the cocaine, weighing 789 kilograms, was transferred to Brooks' motorhome. Brooks was to deliver the cocaine to Houston, but his motorhome developed engine trouble outside of Dallas. Johnson rented a truck to transport the sacks of cocaine the remainder of the journey to Houston. Naranjo, who had travelled to Dallas separately, followed Johnson to Houston in his own vehicle.

Johnson and Naranjo arrived in Houston late at night and registered at a motel. The next morning, they distributed some of the cocaine to individuals whom, according to Johnson, Naranjo had previously contacted to accept part of the shipment. Approximately 200 kilograms of the cocaine were transferred from the rental truck to Naranjo's vehicle. The remainder of the cocaine was driven by Johnson in the truck to another location, where he met individuals who drove the truck away. When the truck was returned, it was

empty.  The next night Johnson, Naranjo, Brooks and another man were paid approximately $150,000.

## D.  Count 4

In the spring of 1990, Naranjo left for Columbia.  He returned to Longview, Texas, with a plan to smuggle cocaine from Guatemala to Longview in metal containers hidden in the air brake tanks of trucks.  Johnson testified that Naranjo shared this plan with him, and told him that they needed local people to obtain a warehouse and to replace the cocaine-laden air brake tanks with new tanks. Johnson recruited Brooks and Lanier to participate in this scheme. With funds furnished by Johnson, Brooks rented a warehouse in Longview and purchased tools needed to dismantle the air brake tanks.

The first two trucks arrived at a motel in Longview in mid-1990.  The drivers notified Naranjo of their arrival, and Naranjo contacted Johnson, Brooks, Lanier and Guillermo Naranjo (another brother).  Two of the men drove the trucks from the motel to the warehouse.  Lanier removed the air brake tanks and installed replacements.  Brooks, Johnson and Guillermo Naranjo assisted him. Brooks then took the tanks to his land in Marion County, Texas, where he and Lanier cut the tanks apart.  Inside the tanks were large metal boxes which contained metal foil sealed pouches. Johnson testified that cocaine was contained in the packages.  The packages of cocaine were stored in inoperative deep freezers buried in the ground.

Every four to six weeks, additional trucks arrived and the

6

process was repeated. When 300-500 kilograms of cocaine were accumulated, the containers would be removed from the deep freezers and driven to a roadside park where a tractor-trailer was parked. The tractor-trailer would contain a legitimate cargo destined for New York, and would be driven by a man known as "Henrietta." According to Johnson and Brooks, the defendant Naranjo would drive Henrietta around the area while Johnson, Brooks and Lanier transferred the cocaine into his tractor-trailer. This procedure was repeated on several occasions.

Johnson testified that Naranjo handed him two suitcases full of money that had been delivered to Naranjo by Henrietta. Naranjo asked Johnson to keep the suitcases until people from Guatemala came for them, and told him that they contained about $1,000,000. Johnson took the suitcases home, opened them, and saw the bundles of cash held together by rubber bands. He took photographs of the money. Two days later, Naranjo retrieved them and said that he would give the money to someone named "Chino'" who was from Guatemala.

Approximately 20 truck shipments arrived in Longview during the spring, summer and fall of 1990. All were successfully dismantled, and the cocaine was transferred to Henrietta without incident. Johnson testified that he and Naranjo were paid $1,700 to $2,500 per truck for their supervisory roles. Lanier stated that he was paid about $1,500 per truck. The operation was discontinued when Johnson, Brooks and Lanier were told that law enforcement authorities had discovered a cache of cocaine hidden in

7

one of the trucks.

## E.   Count 5

Johnson testified that in the spring of 1991 Naranjo took him to Guatemala on a fishing trip.  While there, they met Chino and an individual named "Carlos" who discussed with them a plan to smuggle cocaine in metal boxes inside the fuel tanks of Chevrolet Silverado diesel pickup trucks.  Each truck had two fuel tanks and each tank was capable of concealing 25 kilograms of cocaine.  Once again, the plan called for the trucks to be driven from Guatemala through Mexico and into the United States.

Upon their return to Longview, Naranjo told Johnson that they would be assisted by the defendant Restrepo.  Naranjo indicated that Restrepo was coming to Texas to operate an auto body shop as a front for the smuggling operation.

When Restrepo arrived, his activities were financed by Naranjo and Johnson.  They gave Restrepo $2,000 to $4,000 per month.  In the spring of 1991 Restrepo leased a warehouse on Seven Pines Cut-off Road, made a down payment on a house, and purchased a pickup truck.  Restrepo was introduced to Brooks and Lanier.

In June of 1991 two diesel pickup trucks arrived in Longview. The trucks were taken to the Seven Pines Cut-off Road warehouse. Lanier and Restrepo removed the fuel tanks from the trucks and installed replacements that Restrepo and Johnson had purchased earlier.  Lanier transported the old diesel fuel tanks to Brooks' Marion County property.  There the tanks were cut open, and the cocaine containers removed and stored as before.  Brooks delivered

8

the dismantled tanks to Restrepo's house. Restrepo had planned to weld the tanks together so that they could be re-used, but that plan was abandoned.

Two weeks later two more trucks arrived in Longview, and the process of removing cocaine from the fuel tanks and storing it on Brooks' property was repeated. After work on the second shipment of cocaine had finished, a van arrived from Houston, and the cocaine from all of the fuel tanks was placed in the van for delivery to Houston. Later, Johnson and Naranjo were paid $4,000 to $6,000 each for the shipments.

Thereafter, Johnson invited Lanier to his house to help count money. When Lanier arrived he observed approximately ten trash bags full of wet and mildewing currency. Using a clothes dryer, Johnson dried the bills. Lanier, Restrepo, Brooks and Johnson participated in counting the money. They were unable to complete the task that day. The counting resumed the next day at Naranjo's house. Lanier estimated that they counted more than $300,000 in cash.

No further trucks arrived. Naranjo told Johnson that they had ceased employing that particular smuggling technique because someone was stealing their trucks in Houston.

According to Johnson, in the summer of 1991 Naranjo informed him that a clandestine safe would be installed in Johnson's house and two such safes would be built into Restrepo's house. Johnson's safe was intended to store cash. Restrepo's two safes were to store cocaine; if Restrepo were detected, he could surrender the

9

contents of the smaller of the two safes and thereby protect the cocaine in the larger safe from being found. Johnson gave Brooks cash to rent a van for the man who came to Longview to install the safes. Brooks delivered the van to Restrepo, who was with the safe installer at the time.

## F.  Count 6

In August of 1991 Naranjo's associates shipped a cargo of concrete fence posts from Venezuela to Miami. Cocaine was concealed in some of the posts. Customs officers in Miami discovered some of the cocaine but allowed the shipment to pass through customs under constant surveillance, in an effort to detect the intended recipients. In September, October and November of 1991 the cargo of fence posts was divided and stored by the then unknown custodians in three separate locations in Miami.

In October of 1991 some of the concrete fence posts that contained no cocaine were shipped to Longview. They were stored at the Seven Pines Cut-off Road warehouse that had previously been leased by Restrepo. Naranjo told Johnson that the posts were to be sold; later, Johnson learned that the first load of concrete posts was a "dummy" load, designed to help determine if anyone was watching the shipment. Naranjo told Johnson that the posts were part of a large shipment that concealed about 10,000 kilograms of cocaine. Naranjo and Johnson arranged for some of the posts to be delivered to Houston, in order to determine if the shipment was under surveillance. No surveillance was detected.

Some of the posts were transported by Brooks to his Marion

10

County property.  The purpose of that move was to determine whether Brooks was being followed.  After completing the transfer, Brooks reported to Johnson that he had made the dry run without incident.

In fact, all of these movements had been observed by law enforcement officers maintaining around-the-clock surveillance.  On November 16, 1991, a truckload of concrete posts containing cocaine left Miami for Longview.  Unbeknownst to the conspirators, the driver of the truck who made the delivery was an undercover officer, substituting for the original driver who was an innocent party.

On November 17, Naranjo informed Johnson that a load of concrete posts was on its was to Longview and that about 1,000 kilograms of cocaine had been packed into the concrete.  Naranjo asked Johnson to direct Lanier to help unload the truck when it arrived at the Seven Pines Cut-Off Road warehouse.  Johnson conveyed the message to Lanier, and told him that he would be paid $25 or $30 per kilogram of cocaine.

On November 18, Lanier met Restrepo at the warehouse.  They discussed the expected shipment and the fact that these concrete posts were filled with cocaine.  When the truckload arrived, Lanier signed the shipping order acknowledging receipt of the cargo.  Using a forklift that Restrepo had rented, the two men unloaded the fence posts.

Brooks and Lanier loaded two bundles of the newly arrived shipment of fence posts onto a truck trailer for transfer to Brooks' Marion County property.  Restrepo helped in the loading.

Brooks then drove the truckload to the property. En route, Brooks passed a car which, unknown to Brooks, was driven by a DEA agent. When Brooks arrived at his property, he saw a surveillance plane aloft, but surmised that the plane was part of a fire watch.

Lanier purchased sledge hammers, chisels, a splitting maul, and related equipment at a hardware store, then drove to Marion County to meet Brooks. First they drove around the area to see if they were being watched. Satisfied that they were not under surveillance, they returned to where the concrete posts had been placed and met Johnson who had been sent there by Naranjo.

The task of removing the containers of cocaine from the concrete posts was arduous. Each post contained three one-kilogram packages and six half-kilogram packages. By nightfall, they had completed one bundle of nine posts and had extracted 54 kilograms of cocaine. One small package had ruptured, and the cocaine that had fallen out of the package was placed in a small bag that Johnson kept. He tasted and smelled the powder and verified that it was cocaine.

After the three men had finished working, law enforcement agents entered the property and arrested them. The cocaine that had been extracted from the fence posts and the bag in Johnson's possession were seized.

After his arrest, Johnson agreed to cooperate. He took the officers to his home and produced a photograph album containing photographs of his trip to Guatemala and a picture of the suitcases full of money that he had held for Naranjo. Johnson also showed

12

the officers the secret safe that had been constructed in his home. Johnson, Brooks and Lanier ultimately pled guilty to the charges brought against them and testified against the appellants.

## G. Searches and Seizures

Brooks consented to a search of his Marion County property, where agents seized the cocaine and concrete posts. Johnson agreed to make telephone calls to Naranjo and Restrepo for DEA agent Phillip Rust, tapes of which were later played for the jury. On November 19, warrants were obtained to search Naranjo's home, Restrepo's home, and the Seven Pines Cut-off Road warehouse.

At Naranjo's home the officers found more than $97,000 in a safe, Guatemalan currency, valuable artifacts, valuable coins, an envelope addressed to Johnson containing a list of products and investments in Guatemala, a note pad with the name of the Seven Pines Cut-off Road warehouse written on it, a receipt reflecting that a cashier's check in the amount of $1,000 had been sent to Restrepo, and a daily diary. The diary contained Restrepo's name on the page for the date of August 19, 1991, and an entry appeared on the page for August 21 which read "Get with Henrietta, need hub for tire and seal." The diary also contained other references to Lanier and Restrepo, with a Miami telephone number beside Restrepo's name.

At Restrepo's premises officers found a loaded firearm under a mattress in his bedroom, a pager, address books with entries for Lanier and Naranjo, documents reflecting receipt of the first cargo (four loads) of cement posts at the Seven Pines Cut-off Road

warehouse, a bill of lading reflecting delivery to the warehouse of the second load of concrete posts, a receipt for rental of a forklift, airline ticket receipts showing that he and Naranjo's father had flown to Fort Lauderdale, Florida, in late August 1990 and that the tickets were purchased with cash, and 8 or 10 fuel tanks including one with the top cut off.

At the warehouse officers found new and used fuel tanks, a welding machine, tools, and an earnings statement for Restrepo's employment in 1988. The second load of concrete posts, found outdoors on the warehouse premises, was destroyed so that the cocaine concealed in the posts could be removed.

In Miami the concrete posts still stored in warehouses were also seized. The total amount of cocaine found at the various locations was as follows: 77.36 kilograms, 89% pure, at the Marion County property; 998 kilograms, 92% pure, at the warehouse; 67.26 grams, 82% pure, in the bag seized from Johnson; 446 kilograms, 90% pure, at one of the three storage areas in Miami; 8,001 kilograms, 92% pure, at the second site; and 2,722 kilograms, 92% pure, at the third.

## H.  Post-arrest Statements

On November 19, 1991, Naranjo was arrested and taken to the United States District Courthouse in Tyler, Texas, for his arraignment before a magistrate judge. After being read his rights by the magistrate judge, he indicated to DEA special agent Jackie Grier that he would like to talk with him. Naranjo, Grier and Assistant U.S. Attorney Lou Guirola then met in the U.S. Marshal's

14

office. Mr. Guirola advised Naranjo of his rights again, and Naranjo indicated that he understood his rights and wished to talk. He admitted knowledge of and participation in the smuggling operation in which cocaine was concealed in concrete fence posts, and he disclosed certain details of the operation.

On November 20, 1991, U.S. Customs agent Edward Kacerosky, along with Mr. Guirola and DEA agent David Wilkerson, spoke with Naranjo at the Smith County Sheriff's office. Kacerosky also reminded Naranjo of his rights. Naranjo indicated that he understood his rights and that he wished to speak with Kacerosky. He disclosed essentially the same information which he had disclosed to Agent Grier.

In addition, Naranjo made certain statements of cooperation which were excluded by the district judge at trial. The transcript of the suppression hearing at which the defendant challenged the admissibility of both his statements of confession and of cooperation remains under seal, and, for obvious reasons, the statements of cooperation will not be disclosed.

## II.
## PROCEDURAL HISTORY

Both defendants pled not guilty and trial began on February 24, 1992. Prior to trial, Naranjo filed a motion to suppress all statements of confession and of cooperation as being coerced. The district court denied the motion as to statements of confession, but granted the motion as to statements of cooperation.

Also prior to trial, Restrepo moved to sever his case from

15

that of Naranjo.  Restrepo advised the court that he was aware of a post-arrest confession of Naranjo, and feared that he would be implicated without the opportunity to confront and cross-examine Naranjo.  The district court denied his motion.  Restrepo moved, prior to trial, to suppress evidence obtained from the search of his house on the grounds that the search warrant was unsupported by probable cause, and was so broad as to constitute a general search in violation of the Fourth Amendment.  This motion was also denied.

The case against both defendants proceeded to trial.  After all parties rested, Naranjo moved for judgment of acquittal on counts 2-5.  The district judge carried the motion.  On March 3, 1992, the case was submitted to the jury.  Naranjo was found guilty of counts 1-6, and Restrepo was found guilty of counts 1, 5 and 6.  The district court accepted the jury's verdict, which in effect denied Naranjo's motion for judgment of acquittal.

## III.
## THE ISSUES ON APPEAL

### A.  Naranjo

The defendant Naranjo claims that the district court erred in denying his motion for judgment of acquittal because there was insufficient evidence to support a finding that the substances alleged in counts 2-5 were cocaine.  In the alternative, Naranjo claims that the use of circumstantial evidence to establish the identity of a substance as cocaine, when the substance itself is unavailable, constitutes a violation of his right under the Sixth Amendment to confront the witnesses against him.

16

Naranjo also claims that the district court erred in denying his motion to suppress his oral confession because the confession was involuntary and obtained through the use of coercion.

## B. Restrepo

The defendant Restrepo claims that the district court erred in denying his motion to sever, because his inability to confront and cross-examine his co-defendant concerning Naranjo's post-arrest confession deprived him of a fair trial. Restrepo asserts that when Naranjo's confession was introduced against Naranjo at trial, it also implicated Restrepo, thereby depriving him of a fair trial.

Restrepo also claims that the district court erred in denying his motion to suppress evidence obtained in the search of his house, because the search violated his rights under the Fourth Amendment.

## IV.
## DISCUSSION

## A. The Sufficiency of the Evidence

Naranjo argues that there was insufficient evidence to support a finding that the substance alleged in counts 2-5 was actually cocaine; accordingly, Naranjo argues that it was error for the district court to deny his motion for acquittal on these four charges. We review the district court's denial of a motion for judgment of acquittal de novo. United States v. Leed, 981 F.2d 202, 205 (5th Cir. 1993). "The well established standard in this circuit for reviewing a conviction allegedly based on insufficient

17

evidence is whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir.), cert. denied, __U.S.__, 113 S.Ct. 330, 121 L.Ed.2d 248 (1992). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. United States v. Fuller, 974 F.2d 1474, 1477 (5th Cir. 1992).

Direct and circumstantial evidence adduced at trial, as well as all inferences reasonably drawn from it, is viewed in the light most favorable to the verdict. Sanchez, 961 F.2d at 1173. The jury is the final arbiter of the weight of the evidence, and of the credibility of witnesses. United States v. Barksdale-Contreras, 972 F.2d 111, 114 (5th Cir. 1992), cert. denied, __U.S.__, 113 S.Ct. 1060, 122 L.Ed.2d 366 (1993), cert. denied, __U.S.__, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993).

Finally, the uncorroborated testimony of an accomplice or co-conspirator can be sufficient to support the verdict. United States v. Greenwood, 974 F.2d 1449, 1457 (5th Cir. 1992); United States v. Singer, 970 F.2d 1414, 1419 (5th Cir. 1992); United States v. Osum, 943 F.2d 1394, 1405 (5th Cir. 1991); United States v. Brown, 887 F.2d 537, 542 (5th Cir. 1989); United States v. Eakes, 783 F.2d 499, 504-506 (5th Cir.), cert. denied, 477 U.S. 906, 106 S.Ct. 3277, 91 L.Ed.2d 567 (1986). With these principals in mind, we address Naranjo's claim.

The government sought to prove in counts 2-5 that Naranjo was

instrumental in the delivery of quantities of cocaine to places in eastern Texas and points beyond.  However, because these movements were never detected by law enforcement officers, the substances themselves were never seen by any officers, much less tested.  As a consequence, the government had to rely on circumstantial evidence, particularly the testimony of Johnson, Brooks and Lanier, to prove that the substance was cocaine.

Naranjo recognizes the cases from this circuit holding that uncorroborated testimony of a co-conspirator can be sufficient evidence, but he argues that his case can be distinguished because none of his alleged co-conspirators testified that they were experienced in identifying cocaine, nor did they testify that they had tested it.  In some instances, they did not even testify that they had seen the substance itself.  Naranjo's argument goes to the quantum of the circumstantial proof.  However, while the government's evidence may have been lacking in some respects, it made up for the deficiency in others.  Neither Eakes nor any other decision cited by Naranjo enunciate a minimum standard of circumstantial evidence or demand that the proof include any particular factor as a sine qua non.  The government's responsibility was simply to prove that enough circumstances existed to allow a reasonable jury to conclude beyond a reasonable doubt that the substance was cocaine.

In this case, the circumstantial evidence included the packaging, the clandestine manner in which the substances were handled, the witnesses' admitted familiarity with cocaine, the

uncontested statements by Johnson, Brooks and Lanier that they were handling cocaine, the substantial amounts of money paid to them for their roles in ensuring that the packages were transported without detection, the references to kilograms, the kilogram sizes of the packages, the similarity of the appearance of the packages, the deliveries of hundreds of thousands of dollars in cash, and the multiplicity of the ventures. All of these circumstances, examined together and in context, provided sufficient reason for the jury to conclude that the government had proved beyond a reasonable doubt that Naranjo had trafficked in cocaine, as was alleged in counts 2-5.

In the alternative, Naranjo argues that <u>Eakes</u> and its progeny, to the extent that they do not require the government to produce the substance a defendant is accused of possessing or distributing, are unconstitutional. Naranjo claims that <u>Eakes</u> violates his Sixth Amendment right to confront the witnesses against him.

As this Court has stated in <u>United States v. Herndon</u>, 536 F.2d 1027, 1029 (5th Cir. 1976), the Sixth Amendment right of confrontation deals with witnesses and not physical evidence. <u>See also</u> <u>United States v. Sherrod</u>, 964 F.2d 1501, 1507 n. 18 (5th Cir.), <u>cert. denied</u>, __U.S.__, 113 S.Ct. 832, 121 L.Ed.2d 701 (1992), <u>cert. dismissed</u>, __U.S.__, 113 S.Ct. 834, 122 L.Ed.2d 111 (1992), <u>cert. denied</u>, __U.S.__, 113 S.Ct. 1367, 122 L.Ed.2d 745 (1993), <u>cert. denied</u>, __U.S.__, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993); <u>United States v. Gordon</u>, 580 F.2d 827, 837 (5th Cir), <u>cert. denied</u>, 439 U.S. 1051, 99 S.Ct. 860, 58 L.Ed.2d 711 (1978), <u>cert.</u>

20

denied, 439 U.S. 1079, 99 S.Ct. 860, 59 L.Ed.2d 49 (1979). Here, the witnesses upon whom the government relied to establish the nature of the controlled substance testified at trial and were available for cross-examination.

Moreover, "[t]he Confrontation Clause guarantees only 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Kentucky v. Stincer, 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987), quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985); United States v. Owens, 484 U.S. 554, 559, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988). Here, Naranjo had ample opportunity to cross-examine the witnesses who testified as to the nature of the controlled substance.

## B.  The Oral Confessions

Naranjo argues that the district court erred in denying his motion to suppress his oral confessions because they were involuntary and obtained through the use of coercion. A confession is voluntary if, "under the 'totality of the circumstances,' the statement is the product of the accused's 'free and rational choice.'" United States v. Doucette, 979 F.2d 1042, 1045 (5th Cir. 1992), quoting United States v. Rogers, 906 F.2d 189, 190 (5th Cir. 1990). On appeal, this Court must give credence to the credibility choices and findings of fact of the district court unless they are clearly erroneous. Id. The ultimate issue of voluntariness, however, is a legal question, subject to de novo review. Id. The government has the burden of proving by a preponderance of the

21

evidence that the defendant voluntarily waived his rights and that the statements he made were voluntary. United States v. Rojas-Martinez, 968 F.2d 415, 417 (5th Cir.), cert. denied, __U.S.__, 113 S.Ct. 828, 121 L.Ed.2d 698 (1992), cert. denied, __U.S.__, 113 S.Ct. 995, 122 L.Ed.2d 146 (1993). A confession is voluntary in the absence of official overreaching, in the form of either direct coercion or subtle psychological persuasion. Id. at 418.

Courts consider a number of factors in determining whether a confession is the product of a free will. All of the circumstances are to be considered, including the following, but the presence or absence of any of these five factors need not be conclusive:

(1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment,

(2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession,

(3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him,

(4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel, and

(5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

22

18 U.S.C. § 3501(b). Official overreaching, with regard to the voluntariness of the waiver of rights and to the voluntariness of the confession itself, can take forms other than physical coercion. Psychological coercion can be a form of official misconduct. Colorado v. Connelly, 479 U.S. 157, 164, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986). Promises or inducements can taint the voluntariness of a confession. United States v. McClure, 786 F.2d 1286, 1289 (5th Cir. 1986).

Prior to trial, Naranjo filed a motion to suppress all statements of confession and statements of cooperation as being coerced. The motion was heard on Friday, February 21, 1992, and the transcript of the hearing remains under seal pursuant to an Order of the district court. At the conclusion of the hearing, the district judge took the matter under advisement. On February 24, 1992, immediately prior to trial, the Court ruled on Naranjo's motion:

First of all, the government (sic) denies in part and grants in part Defendant Naranjo's motion, particularly as follows. The fact that a Defendant may have post arrest cooperated with the government for some period of time is suppressed. The fact that a Defendant may have participated in telephone calls that may have been recorded or the contents of those calls is suppressed. If the government has any statements from agents or others involved that may be offered, those will be submitted for examination by the Court to determine

23

whether portions should be redacted.

Counsel for the government and both Defendants shall not communicate the fact of cooperation or the Court's ruling in this respect to anyone, including other Defendants.

. . .

The Court is not suppressing and the motion is denied in this respect, any statements made by Defendant Naranjo in the nature of confessions. Now, I appreciate the fact that there may be reasonable dispute about what amounts to confession or whether a statement might be one of cooperation, implicate other people or potentially other people. Anything that comes close to falling in that category before the government would offer it, approach the bench for the Court to rule on it.

At the trial, statements of confession were admitted through two of the government's witnesses: Jackie Grier, a DEA special agent, and Edward John Kacerosky, a U.S. Customs agent. The agents spoke to Naranjo on two separate occasions. Both agents testified that Naranjo was read his rights, that he indicated he understood them, and that he indicated he wished to talk to them. Naranjo admitted to both agents that he had knowledge of and participated in the venture that brought 1,080 kilograms of cocaine to Texas, and that the first shipment of concrete fence posts was a dry run. He also told agent Kacerosky that the ultimate destination of the cocaine was New York.

Agent Grier testified that Naranjo indicated to him that he knew of the existence of an additional 12,000 kilograms of cocaine in the vicinity of Miami, Florida. Grier testified that Naranjo told him that people in Florida had detected drug enforcement surveillance there and that they intended to transport the entire 12,000 kilograms to east Texas if all went well with the first shipment.

Agent Kacerosky also testified that Naranjo told him of the presence of approximately 10,000 kilograms of cocaine in Miami. Naranjo told Kacerosky that he had made three trips to Miami from east Texas for the purpose of obtaining expense monies for the operation, ranging from $30,000 to $50,000 per trip. Agent Kacerosky stated that Naranjo told him the purpose of the expense monies was to rent a warehouse to set up a "caleta," and to hire a person to mind the "caleta."[3]

A defendant is entitled to a fair hearing and reliable determination of the voluntariness of a confession prior to its use at trial. Jackson v. Denno, 378 U.S. 368, 378, 84 S.Ct. 1774, 1781, 12 L.Ed.2d 908 (1964). At this hearing, "both the underlying factual issues and the voluntariness of [the] confession [must be] actually and reliably determined." Id., 378 U.S. at 380, 84 S.Ct.

_____

[3] At this point, counsel for Restrepo objected on the grounds that the reference to a "caleta" implicated his client, creating a Bruton error, and moved for a mistrial. On the next day of trial, the district judge instructed the jury to disregard Agent Kacerosky's testimony regarding expense monies, the warehouse, the "caleta," and a person to mind the "caleta." Our discussion regarding Restrepo's objection follows. For discussion purposes as to Naranjo, we will disregard this particular jury instruction.

25

at 1783. "Although the judge need not make formal findings of fact or write an opinion, his conclusion that the confession is voluntary must appear from the record with unmistakable clarity." Sims v. Georgia, 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967).

We have reviewed the sealed transcript of the February 21, 1992, suppression hearing and find that although the judge did not make his ruling until the following Monday, at the conclusion of the hearing on Friday he made a specific finding that the confessions were made after adequate warnings and were voluntary. In addition, we find ample evidence to support the district judge's ruling. Implicit in his ruling is the factual finding that the government's witnesses were more credible than Naranjo. The government's witnesses admitted that certain promises were made to Naranjo, but that they were made toward the end of his period of cooperation, and that the confessions were made at the beginning of his period of cooperation.

Naranjo submits, however, that his confessions were "intertwined" with his decision to cooperate. He argues that by suppressing the statements of cooperation, the district court impliedly ruled that any statements made during the period of cooperation should be suppressed. Thus, he contends, if the confessions were made during the period of cooperation, the district court erred in denying Naranjo's motion as to his confessions.

Our reading of the suppression hearing transcript does not

26

support Naranjo's contention.  At the beginning of the hearing, the judge stated that he was concerned with the alleged promises made to Naranjo by the government.  This issue was fully developed during the hearing, both by counsel and by the judge who also questioned the witnesses.  Although no explicit finding was made concerning the sequence of events, it is clear from the record as a whole that the district judge found that the promises or inducements were not made until after Naranjo's confessions.

We find that the district judge's decision to credit the testimony of the government's witnesses over that of Naranjo was not clearly erroneous.  We therefore agree with the ruling of the district court that the government carried its burden of showing that, under the totality of the circumstances, Naranjo's confessions were voluntary.  The district court did not err in denying Naranjo's motion to suppress.

## C.  Restrepo's Objection to the Testimony of Agent Kacerosky

Prior to trial, Restrepo filed a motion to sever his trial from the trial of his co-defendant, Naranjo, which motion was denied.  During the trial, Agent Kacerosky testified that Naranjo had told him about trips to Miami to pick up expense monies for "this operation," which monies were to be used to rent a warehouse as a "caleta," or hiding place, and to hire someone to mind the caleta.  At this point, Restrepo's counsel objected.  Outside the presence of the jury, Restrepo moved for a mistrial, but the district judge denied the motion.  On the day following Agent Kacerosky's testimony, the judge read aloud the testimony to which

27

Restrepo's counsel had objected and instructed the jury: "You will completely disregard the questions and the answers and not consider [the testimony] for any purposes and not take it into consideration at all in your deliberations."

Restrepo argues that the damage done by Agent Kacerosky's testimony was irreparable, and is sufficient to entitle him to a new trial. The government argues that the instruction cured any problem that might have been created, that Naranjo's statement, as related by Kacerosky, never directly implicated Restrepo, and that, in any event, the statement could not have been a crucial factor in the jury's consideration of the case against Restrepo.

Rule 14, Fed.R.Crim.P., provides in part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

The decision of whether a severance of defendants is warranted lies within the district court's discretion, and "we do not disturb that decision unless we find abuse of that discretion." United States v. Lopez, 979 F.2d 1024, 1035 (5th Cir. 1992). To demonstrate that the district court abused its discretion, an appellant "must show that he received an unfair trial, which 'exposed [him] to compelling prejudice against which the district court was unable to afford protection.'" Id., quoting United States v. Kane, 887 F.2d

28

568, 571 (5th Cir. 1989), cert. denied, 493 U.S. 1090, 110 S.Ct. 1159, 107 L.Ed.2d 1062 (1990).

A defendant's Sixth Amendment right to confrontation is violated when (1) several co-defendants are tried jointly, (2) one defendant's extrajudicial statement is used to implicate another defendant in the crime, and (3) the confessor does not take the stand and is thus not subject to cross-examination. Bruton v. United States, 391 U.S. 123, 127, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), cert. denied, 397 U.S. 1014, 90 S.Ct. 1248, 25 L.Ed.2d 428 (1970). Under these circumstances, "[s]everrance of the trials is proper, but only in cases where a defendant's statement directly incriminates his or her co-defendants without reference to other, admissible evidence." United States v. Beaumont, 972 F.2d 91, 95 (5th Cir. 1992) (emphasis added). Bruton is not violated unless the co-defendant's statement directly alludes to the appellant, even if the evidence "makes it apparent that the defendant was implicated by some indirect references." Id., quoting United States v. Espinoza-Seanez, 862 F.2d 526, 534 (5th Cir. 1988). Bruton issues are also reviewed under the abuse of discretion standard. Beaumont, 972 F.2d at 95.

Restrepo argues that this was precisely the kind of problem he sought to avoid by his motion to sever. When the Bruton problem arose, Restrepo moved for a mistrial, but his motion was denied. He now contends that the district judge should be reversed and he should be granted a new trial. The government points out that Naranjo never directly mentioned Restrepo; therefore, the statement

29

cannot be said to fall within the proscription of <u>Bruton</u>.

The Supreme Court has recently limited the application of Rule 14 in <u>Zafiro v. United States</u>, __U.S.__, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). The Court, reviewing a severance request based on mutually antagonistic defenses, concluded that when defendants have been joined under Rule 8, Fed.R.Crim.P., the district court should grant a severance only if there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro</u>, 113 S.Ct. at 938. The Court stated that such a risk might occur when evidence is introduced that is probative of a defendant's guilt but is technically admissible only against the co-defendant. <u>Id</u>. The Court then concluded, however, that in such a case "less drastic measures, such as a limiting instruction," will often suffice to prevent the risk of prejudice. <u>Id</u>.

Restrepo claims that the district court should have severed his trial from the trial of Naranjo because of testimony that was admissible against Naranjo but not against Restrepo. However, since both Restrepo and Naranjo were convicted of essentially the same conspiracy, "severance is not required merely because the Government introduced evidence admissible only against" a co-defendant. Restrepo's argument also fails under <u>Bruton</u>. With <u>Bruton</u> claims, "we have held it to be critical to determine whether the out-of-court statement 'clearly implicates the co-defendant.'" <u>Foy v. Donnelly</u>, 959 F.2d 1307, 1312 (5th Cir. 1992), quoting

30

<u>Espinoza-Seanez</u>, 862 F.2d at 534. <u>Bruton</u> is not violated unless Naranjo's statement directly alludes to Restrepo, which it clearly does not. Pointing to references in the statement that Naranjo sought to obtain a "caleta" and someone to mind it, Restrepo evidently contends that <u>Bruton</u> is implicated since the other evidence adduced at trial made Restrepo's connection apparent, thereby indirectly connecting him to Naranjo's post-trial confession. However, the rule in this circuit is that an indirect reference to a co-defendant is not enough to bring a statement within the proscription of <u>Bruton</u>.

Furthermore, the district court gave a limiting instruction that the specific portion of the statement was to be totally disregarded. In any event, even without the limiting instruction, we find that Naranjo's statement could not have been a crucial factor in the jury's consideration of the case against Restrepo. The jury heard clear and abundant evidence implicating Restrepo in the conspiracy count and counts 5 and 6. The evidence came not only from co-conspirators Johnson, Brooks and Lanier, but also from agents who watched Restrepo's movements and discovered the hidden safes in his house, and from local citizens such as one witness who testified that the Seven Pines Cut-off Road warehouse was rented by Restrepo purportedly for an auto repair shop that never materialized, and another who rented a forklift to Restrepo so that he could lift concrete posts onto the truck that took them to Brooks' property. Thus, even if there were a <u>Bruton</u> error, we find it would be harmless beyond a reasonable doubt.

31

**D. The Search of Restrepo's House**

On November 18, 1991, a search warrant was issued by a federal magistrate judge for the search of Restrepo's house. Restrepo argues that the search warrant was unsupported by probable cause. Restrepo also argues that the warrant was so broad as to constitute a general search in violation of the Fourth Amendment. He contends that the evidence seized pursuant to the search should have been suppressed as "fruit of the poisonous tree."

The government acknowledges that the affidavit supporting the search warrant did not describe any drug activity occurring at Restrepo's house. The government argues, however, that the affidavit contained enough information derived from the affiant's experience and from his and other agents' observations to allow the magistrate judge to conclude that evidence of illegal drug activity could be found at the house. In addition, the government offers other bases to sustain the district court's ruling that the evidence should not be suppressed: (1) Restrepo's motion was not timely made; (2) the affidavit met the test of probable cause; and (3) the warrant met the good faith exception to the exclusionary rule. The government also argues that the admission into evidence of the seized items, if error, was harmless beyond a reasonable doubt.

"We engage in a two-step review of a district court's denial of a motion to suppress evidence obtained pursuant to a warrant: (1) whether the good-faith exception to the exclusionary rule applies; and (2) whether probable cause supported the warrant."

32

United States v. Satterwhite, 980 F.2d 317, 320 (5th Cir. 1992). If we decide that the good-faith exception applies, we need not reach the probable cause issue.  Id.

Restrepo's argument is basically the same this court addressed in United States v. Pigrum, 922 F.2d 249 (5th Cir.), cert. denied, ___U.S.___, 111 S.Ct. 2064, 114 L.Ed.2d 468 (1991).  In Pigrum, the appellant argued that the district court erred in denying his motion to suppress evidence seized in the search of his house because there was no probable cause for the issuance of the warrant.  The appellant also argued that the warrant "was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," thereby precluding a good faith exception under United States v. Leon, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).  This court first addressed the latter argument, noting that under Leon's good faith exception to the exclusionary rule, evidence will be admitted if it is obtained by officers acting in objectively reasonable reliance on a search warrant issued by a magistrate judge; furthermore, "[t]his is so even if the affidavit on which the warrant was based is insufficient to establish probable cause."  Pigrum, 922 F.2d at 252.  The first issue that must be addressed, therefore, is whether the officers reasonably relied on the magistrate judge's determination in light of the information set forth in the affidavit.  Id.  We review de novo the reasonableness of an officer's reliance upon a warrant issued by a magistrate judge. Satterwhite, 980 F.2d at 321.

33

In Pigrum, we concluded that "when a warrant application is supported by more than a 'bare bones affidavit' containing wholly conclusionary statements, it is appropriate for officers to rely on the warrant's validity." Pigrum, 922 F.2d at 252. A "bare bones" affidavit lacks the facts and circumstances from which a magistrate judge can independently determine probable cause. Satterwhite, 980 F.2d at 321.

The affidavit supporting the warrant for the search of Restrepo's house was provided by DEA special agent Jackie Grier. It began with a lengthy statement that in his more than 11 years of experience, he had observed that drug traffickers maintain records relating to drug activity at a place such as a home, for ready access; and that contraband, drug proceeds and other indicia of drug trafficking such as coded telephone numbers, photographs and firearms are secreted in safe places such as homes.

The affidavit also contained information Agent Grier learned during the course of his investigation leading to Restrepo's arrest. He described the shipments of concrete fence posts containing cocaine from Venezuela to Miami, the fact that the intended named recipient company's offices were staffed by temporary workers and did no business, and the delivery of four truckloads of concrete fenceposts to the Seven Pines Cut-off Road warehouse. He also described Restrepo's association with the warehouse as its lessee, Restrepo's purchase of the home in White Oak, Texas, in June or July of 1991, after he had leased the warehouse, and Restrepo's observed presence at the warehouse. The

34

affidavit noted the absence of any legitimate business activity or even telephone service at the warehouse, Restrepo's avowed lack of familiarity with a forklift when he took delivery of a truckload of concrete posts, and the presence of equipment in the warehouse that was consistent with a drug smuggling technique involving the use of hidden compartments in vehicles. Agent Grier described Restrepo's refusal to sign his full name legibly on the bills of lading, the delivery of more fence posts to the warehouse in November of 1991, the surveillance of the movement of those fence posts to Marion County, the arrests of Brooks, Johnson and Lanier, and the discovery of 297 pounds of cocaine at the Marion County location.

Regarding Restrepo's residence, the affidavit offered the following information:

1. Restrepo obtained utilities for the residence in June or July of 1991; the house was owned by "Cleo Harrell Bales";

2. The house was secluded with its only means of egress and ingress essentially being a dead-end road;

3. The Ford truck registered to Restrepo was observed traveling to this residence on October 24, 1991;

4. No other individuals had been observed there since periodic surveillance began;

5. The telephone number was in the name of Restrepo; telephone calls were made to Miami, Ft. Lauderdale, Columbia, California, and Houston; a call was made to a company near Tyler, Texas, that sold digital scales;

Columbia is a known source country for cocaine; South Florida is designated a "High Intensity Drug Area"; Miami is the location from which the fence posts originated.

The affidavit also provided other information about Restrepo. He was observed by an agent at the post office when he was attempting to renew his post office box. He refused to reveal to the postal clerk the address either of his business or of his residence, and he left without renewing the post office box. The affiant stated that this behavior is consistent with the actions of drug traffickers who do not wish to be identified or associated with given locations or names during the course of unlawful activities. The affidavit also contained facts pertaining to the probable cause of cocaine being present at the warehouse and of the occurrence of drug trafficking at the warehouse.

This affidavit is more than a mere "bare bones" affidavit. It furnished sufficient information to allow the conclusion that a fair probability existed that seizable evidence would be found in Restrepo's house. The officers' reliance on the magistrate judge's determination of probable cause was objectively reasonable, and the good faith exception to Leon's exclusionary rule applies.

Since the officers acted in good faith in relying on the warrant, we need not address the issue of probable cause for the warrant. However, probable cause "does not require proof beyond a reasonable doubt; 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" United States v. Brown, 941 F.2d 1300, 1302 (5th Cir.), cert.

36

denied, ___U.S.___, 112 S.Ct. 648, 116 L.Ed.2d 665 (1991), quoting Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).  A magistrate judge's determination is entitled to great deference; furthermore, a magistrate "need only have a substantial basis for concluding that a search would uncover evidence of wrongdoing."  Id.

In the affidavit on which the search warrant was based, Restrepo's criminal activity was demonstrated.  He was the person the undercover agents contacted when they arrived in Texas with the cocaine, and he was the one who actually unloaded the posts containing the cocaine.  On the day the posts arrived in Texas, October 24, 1991, Restrepo's truck was observed at the warehouse as well as at his residence.  Restrepo's mailing address was a post office box, and he refused to give the post office the location of either his business or his residence.  It thus appears to us that the magistrate judge had a substantial basis on which to conclude that a search of Restrepo's residence would uncover wrongdoing.  The affidavit meets the test of probable cause.

## V.
## CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.