**REVISED**

**UNITED STATES COURT OF APPEALS**
**FIFTH CIRCUIT**

_____

No. 95-30998
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DON R WILSON, a/k/a BIG DON; ALFRED L BROWN, a/k/a GOAT; TROY BELLAMY, a/k/a BOW LEG; SEBASTIAN RICHARDSON, a/k/a BAM BAM; REGINALD D WILSON; a/k/a REG; DONALD R MILLER, a/k/a BIG DADDY; PATRICK D MILLER, a/k/a PATCHY CAT; RODERICK ALLEN, a/k/a BABY HULK; ALONZO BATES, a/k/a LITTLE MAN; DEXTER D CHAMBERS, a/k/a DEXTER HOLMES,

Defendants-Appellants.

_____

Appeals from the United States District Court
For the Western District of Louisiana

_____

June 26, 1997

Before REYNALDO G. GARZA, SMITH, and EMILIO M. GARZA, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

A federal district court in Louisiana convicted defendants, members of a Shreveport, Louisiana street gang called the "Bottoms Boys," of various federal offenses related to their participation in a drug trafficking conspiracy and a conspiracy to commit violent

crimes in aid of racketeering. Defendants appeal their convictions and sentences, raising a blizzard of legal challenges. We affirm in part, vacate in part, remand in part for hearings, and remand in part for a new trial.

I

The Bottoms Boys are a street gang operating in the Ledbetter Heights neighborhood of Shreveport, formerly known as "the Bottoms." Until recently, members of the gang conducted a large-scale, open-air drug market, primarily in the 1100 block of Fannin Street. The Bottoms Boys controlled the sale of drugs within this area; no one could sell within Bottoms Boys territory unless they were members of the gang or received permission from one of the leaders of the gang, the so-called "Original Gangsters" or "O.G.s." The Bottoms Boys had the reputation as the toughest gang in Shreveport; anyone who crossed or "dissed" the gang often received a violent, sometimes deadly, response. Firearms were a fashionable Bottoms Boys accessory.

Defendant Alfred Brown served as the gang's principal drug supplier. Testimony established that Brown would distribute cocaine that he obtained in Houston to other leaders of the gang, who would then "front"))that is, distribute without payment up front))smaller amounts to members, until rocks of crack cocaine tumbled down to street level. Sales were highly lucrative; one former gang member testified that in an average week he made about $16,000 from drug sales. In addition, the gang had various

"enforcers," also called "reapers," who enforced the rules of the gang and protected its territory and drug trade through acts of violence.

Police conducted a lengthy investigation of the gang. Undercover law enforcement officers and government informants purchased cocaine from gang members on several occasions, many under the watchful eye of hidden surveillance cameras. Some of these drug buys formed the basis for individual drug distribution counts in the indictment; others served as trial evidence in support of the drug conspiracy. The investigation culminated in the arrest of fourteen gang members. A federal grand jury returned a thirty-nine count indictment, charging thirteen members with various federal offenses, including drug conspiracy, drug distribution and possession with intent to distribute, conspiracy to commit violent crimes in aid of racketeering, and firearms charges.

In addition, the indictment charged several defendants with engaging in or threatening particular acts of violence in violation of 18 U.S.C. § 1959(a). Don Wilson, one of the leaders of the gang, directly threatened Officer Robin Snyder while she was inventorying property in a vacant house in the 1100 block of Fannin street. Wilson told her: "Shine, I am going to fucking kill you." Reginald Wilson fatally shot twin brothers Michael and Mitchell Henderson as they sat in their car in the 1100 block of Fannin Street. Patrick Miller shot and wounded Donny Williams, a member

-3-

of a rival gang, after he and his companions "dissed" the Bottoms Boys by "throwing" rival gang signs.  The government presented other, uncharged acts of violence  as proof of participation in a broad conspiracy to commit violent acts on behalf of the gang.

Two defendants pleaded guilty before trial, and the court declared a mistrial as to another defendant for medical reasons. Of the remaining eleven defendants, the jury returned guilty verdicts against all but one.[1]  The district court denied defendants' motions for judgment of acquittal and new trial.  After sentencing, all ten defendants filed timely notices of appeal.

## II
## DRUG CONSPIRACY

### A

Each defendant argues that the evidence was insufficient to support his conviction for participation in the drug conspiracy under 21 U.S.C. §§ 841(a)(1) and 846.  At trial, defendants moved for acquittal, which the district court denied.  We review a denial of a motion for judgment of acquittal *de novo*.  *United States v. Restrepo*, 994 F.2d 173, 182 (5th Cir. 1993).  We must draw all

---

The jury convicted all defendants of drug conspiracy under 21 U.S.C. § 846, and all defendants except Donald Miller of at least one substantive drug offense under 21 U.S.C. § 841(a)(1). Don Wilson, Sebastian Richardson, Alfred Brown, Reginald Wilson, and Patrick Miller were convicted of violent crimes in aid of racketeering under 18 U.S.C. § 1959(a).  Alfred Brown, Reginald Wilson, and Patrick Miller were convicted of use of a firearm during a crime of violence or drug trafficking crime under 18 U.S.C. § 924(c).  Don Wilson was convicted of engaging in a continuing criminal enterprise under 21 U.S.C. § 848(a).

reasonable inferences in favor of the verdict and affirm the convictions if a reasonable jury could find that the evidence establishes the guilt of the defendants beyond a reasonable doubt. *Id.* The jury may choose among reasonable inferences from the evidence, and the evidence need not exclude every hypothesis of innocence. *United States v. Okoronkwo*, 46 F.3d 426, 430 (5th Cir. 1995), *cert. denied*, ___ U.S. ___, 116 S. Ct. 107, 133 L. Ed. 2d 60 (1995).

To establish a drug conspiracy under 21 U.S.C. § 846, the government must prove: (1) the existence of an agreement between two or more persons to violate federal narcotics laws; (2) that the defendant knew of the agreement; and (3) that the defendant voluntarily participated in the agreement. *United States v. Gallo*, 927 F.2d 815, 820 (5th Cir. 1991). No overt acts in furtherance of the conspiracy need be alleged or proved. *United States v. Shabani*, 513 U.S. 10, ___, 115 S. Ct. 382, 385, 130 L. Ed. 2d 225 (1994). The requisite elements may be proved by circumstantial evidence, and "[c]ircumstances altogether inconclusive, if separately considered, may, by their number and joint operation . . . be sufficient to constitute conclusive proof." *United States v. Roberts*, 913 F.2d 211, 218 (5th Cir. 1990) (citation omitted), *cert. denied*, 500 U.S. 955, 111 S. Ct. 2264, 114 L. Ed. 2d 716 (1991).

Most of the evidence at trial consisted of testimony of former

gang members and officers in the sting operation. Several defendants urge that the evidence is insufficient to support their convictions because it showed only that they were members of the Bottoms Boys and that they had, at some point in time, sold drugs on the 1100 block of Fannin Street. Although mere presence and association with wrongdoers is insufficient to support a conspiracy conviction, it is a factor that the jury may consider in conjunction with other evidence in finding a defendant guilty of the conspiracy. *United States v. Lechuga*, 888 F.2d 1472, 1476 (5th Cir. 1989). Once the government has shown the existence of an illegal conspiracy, it need produce only "slight evidence" to connect an individual defendant to the scheme. *United States v. Duncan*, 919 F.2d 981, 991 (5th Cir. 1990), *cert. denied*, 500 U.S. 926, 111 S. Ct. 2036, 114 L. Ed. 2d 121 (1991).

Testimony of former gang members, government surveillance video, and home movies made by the Bottoms Boys (later admitted into evidence at trial) showed that all defendants were members of the gang and that the gang was an organized, drug-dealing enterprise. All defendants sold drugs on Bottoms Boys turf; the evidence showed that this was impossible absent membership in the gang or without permission from one of the original gangsters, or "O.G.s," such as Don Wilson. A rational jury could infer voluntary participation in the conspiracy from these facts.

Next, the defendants argue that there is a prejudicial

-6-

variance between the indictment, which charges a single conspiracy, and the proof at trial, which they suggest tends to show the existence of multiple conspiracies.  The principal considerations for determining whether the evidence supports a single conspiracy or multiple conspiracies are (1) the existence of a common goal, (2) the nature of the scheme, and (3) the overlapping of the participants in the various dealings. *United States v. Morris*, 46 F.3d 410, 415 (5th Cir.), *cert. denied*, ___ U.S. ___, 115 S. Ct. 2595, 132 L. Ed. 2d 842 (1995).  In examining these factors, "[w]e must affirm the jury's finding that the government proved a single conspiracy unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt."  *Id.* (citation omitted).

The goal of selling cocaine for profit satisfies the common-goal requirement. *United States v. Maceo*, 947 F.2d 1191, 1196 (5th Cir. 1991), *cert. denied*, 503 U.S. 949, 112 S. Ct. 1510, 117 L. Ed. 2d 647 (1992).  With respect to the nature of the scheme, we look at the degree of interdependence of the actions of members of the conspiracy))that is, whether the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme. *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989).  With respect to the required nexus among participants, there is no requirement that every member must

participate in every transaction to find a single conspiracy. Parties who knowingly participate with core conspirators to achieve a common goal may be members of a single conspiracy. *United States v. Richerson*, 833 F.2d 1147, 1154 (5th Cir. 1987). If the conspiracy functions through a division of labor, each participant need not have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy. *Id.*

Don Wilson (whose brief was adopted by all other defendants) argues that the evidence fails to satisfy the second and third requirements for a single conspiracy. Wilson argues that the evidence showed that sellers on Fannin Street sold drugs in competition with one another, not in concert; therefore, he asserts, there was no showing of interdependence between the various aspects of the alleged conspiracy. Moreover, Wilson argues that, although the evidence showed that he, Brown, and Richardson each "employed" other gang members to sell drugs, the government did not demonstrate any overlap among workers in these smaller conspiracies.

The government, however, cites to sufficient evidence in the record to support a jury finding of a single, overarching conspiracy. The fact that individual dealers sold in competition with one another does not preclude a finding of a single conspiracy. *United States v. Ross*, 58 F.3d 154, 158 (5th Cir.), *cert. denied*, ___ U.S. ___, 116 S. Ct. 404, 133 L. Ed. 2d 323

(1995).  The jury could infer from the evidence that the competition was not cutthroat rivalry, but friendly competition among those pursuing a common goal as Bottoms Boys gang members. Moreover, the organizational structure of the gang supports a finding of a single conspiracy.  Testimony established that the gang's structure included organizers, suppliers, middlemen, street sellers, and "reapers" who protected the gang's "turf." Apparently, Brown was the main drug supplier for the "O.G.s" (Don Wilson, Reginald Wilson, Sebastian Richardson, and Donald Miller), who then fronted drugs to other gang members, who sold directly on the street.  In fact, the government asserts that the testimony at trial shows that every defendant received some, if not all, of his cocaine from Brown, either directly or indirectly.  A single conspiracy may exist between two or more individuals selling in competition with one another who share a common supplier, *Ross*, 58 F.3d at 158, or who knowingly participate with the same core conspirators in pursuit of a common goal. *Richerson*, 833 F.2d at 1154.  We have held that a "single conspiracy exists where a 'key man' is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal." *Morris*, 46 F.3d at 416.

The jury's determination that a single drug conspiracy existed in this case does not involve particularly complicated evidence or facts that were likely to confuse triers of fact.  Much of the

conspiracy evidence was direct testimony about drug sales and the organization of the conspiracy. After review of the evidence in the record, we conclude that a reasonable jury could find, beyond a reasonable doubt, the existence of a single drug conspiracy involving each defendant. Accordingly, we find no error in the district court's denial of the motion to acquit.

B

The defendants assert that the district court erred in determining the quantity of drugs attributable to them for the purposes of sentencing. In sentencing a defendant for participation in a drug conspiracy, the court must make findings with respect to (1) when the defendant joined the conspiracy, (2) what drug quantities were within the scope of the agreement, and (3) what quantities the defendant could reasonably foresee being sold by the conspiracy. *United States v. Carreon*, 11 F.3d 1225, 1236 (5th Cir. 1994). Relevant conduct under Sentencing Guidelines § 1B1.3(a)(1)(B) includes all reasonably foreseeable acts of others in furtherance of the conspiracy. United States Sentencing Commission, *Guidelines Manual*, § 1B1.3(a)(1)(B), comment. (n.1) (1995). However, the reasonable foreseeability of all drug sales does not automatically follow from membership in the conspiracy. *United States v. Puig-Infante*, 19 F.3d 929, 942 (5th Cir.), *cert. denied*, 513 U.S. 864, 115 S. Ct. 180, 130 L. Ed. 2d 115 (1994). We review the district court's determination of relevant conduct

during sentencing for clear error. *United States v. Rivera*, 898 F.2d 442, 445 (5th Cir. 1990).

Several defendants argue that the district court failed to make the required specific findings with respect to time frame of membership, overall quantity, and reasonable foreseeability of drug sales. However, the district court determined the dates of membership in the conspiracy for each defendant and adjusted the quantities attributable to him accordingly. The court did not accept speculative testimony or extrapolate to compute the quantity of drugs sold. It used only two sources to calculate a *minimum* drug quantity for relevant conduct purposes: documented evidence of actual drug transactions totaling 25.45 grams of crack cocaine and .78 grams of powder cocaine, and sales admitted by co-conspirator Rashaun Kimble totaling 266 grams of crack cocaine and 112 grams of powder cocaine. Finally, in making its reasonable foreseeability determination, the court specifically found that each defendant was aware of the acts of all. We find that these explicit findings satisfy the court's duty under *Carreon*.

The defendants also argue that the district court erred in including the amounts sold by Rashaun Kimble in their quantity determinations, because these sales had no connection to them and were not reasonably foreseeable. However, Kimble was an admitted member of the conspiracy. Kimble testified that he was a Bottoms Boy, that he sold drugs in the 1100 block of Fannin, and that he

received his cocaine from Brown.  The evidence at trial showed that defendants all sold drugs in the open on the same block, and that it was impossible to sell drugs at that location without the gang's permission.  The nature of the open-air drug market on Fannin Street supports the district court's finding that the full volume of sales, including Kimble's, was foreseeable, if not actually witnessed, by the defendants.

## III
### VIOLENT CRIMES IN AID OF RACKETEERING

Reginald Wilson, Don Wilson, and Patrick Miller challenge the sufficiency of the evidence used to convict them of committing certain violent crimes in aid of racketeering in violation of 18 U.S.C. § 1959(a) ("VICAR").  The three, along with Alfred Brown and Sebastian Richardson, also challenge the sufficiency of the evidence to support their convictions for participation in a VICAR conspiracy.  Section 1959(a) provides in pertinent part:

> Whoever, . . . for the purpose of . . . maintaining or increasing position in an enterprise engaged in racketeering activity, murders, . . . maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished))
> (1) for murder, by death or life imprisonment, or a fine under this title, or both; . . .
> (3) for assault with a dangerous weapon or assault resulting in serious bodily injury, by imprisonment for not more than twenty years or a fine under this title, or both;
> (4) for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both;

(5) for attempting or conspiring to commit murder or kidnapping, by imprisonment for not more than ten years or a fine under this title, or both; and
(6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not more than three years or a fine under this title, or both.

According to the definitions section of 18 U.S.C. § 1961(1), drug trafficking constitutes "racketeering activity" for the purposes of VICAR under 18 U.S.C. § 1959(b)(1).

A

The jury convicted Don Wilson of threatening to kill Officer Robin Snyder (count six) and convicted Patrick Miller of shooting Donny Williams (count fourteen). In reviewing a challenge to the sufficiency of the evidence, the court of appeals asks "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); *United States v. Krenning*, 93 F.3d 1257, 1262 (5th Cir. 1996). To prove a substantive VICAR offense, the government must show that the defendant committed the violent act for the purpose of maintaining or increasing his position in an association or enterprise engaged in racketeering activity. *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1160, 130 L. Ed. 2d 1116 (1995). Self-

-13-

promotion need not be the defendant's sole or primary concern; rather, Congress intended to proscribe violent acts committed "'as an integral aspect of membership' in such enterprises." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) (citation omitted), *cert. denied*, 510 U.S. 856, 114 S. Ct. 163, 126 L. Ed. 2d 124 (1993).

Don Wilson and Patrick Miller do not deny that they committed the acts alleged. However, they argue that the government presented no evidence showing that they committed the charged offenses in order to maintain or increase their positions within the gang. Former gang members Howard Richardson, James Bledsoe, and Rashaun Kimble and witness Donny Watts testified at trial that Wilson often carried guns, and Richardson testified that Wilson acted as an enforcer or "reaper" who "put[] in work" upholding the Bottoms Boys' territory and protecting the drug trade. "Reapers" received their ominous title based on their willingness to commit violent acts on behalf of the gang; Richardson described a "reaper" as "the person that when your number is up is called for your soul that comes to get you." From this evidence, the jury could reasonably have inferred that Wilson was acting in his capacity as a "reaper" when he threatened Officer Snyder and that such threats (or worse) were expected of him based on his position within the gang.

Similarly, the government presented evidence that various

individuals, including the victim, were "throwing" rival "gang signs" just before Patrick Miller shot Donny Williams. Gangs generally identify themselves with hand gestures. Howard Richardson testified that when a member of the Bottoms Boys flashed his gang sign in an upward direction to a member of another gang, the second individual would flash his own gang sign "up" followed by the Bottoms Boys' sign "down," thus signaling that he was "down with" the Bottoms Boys))that is, that he respected them. Richardson testified that violation of gang sign protocol))for example, by failing to give a "down" acknowledgment))constituted "dissing," or disrespect to the gang, and members were expected to retaliate with violence in the event of such an affront. Otherwise they were "punked out" and considered "bitched"))that is, they lost the respect of fellow gang members.

Although the VICAR statute does not criminalize mere retaliation for "dissing" an individual or a social organization, the statute does criminalize violent acts committed as an integral aspect of membership in a racketeering enterprise. *Id*. Drug trafficking is a dangerous business; Howard Richardson testified that the Bottoms Boys carried weapons for the express purpose of protecting themselves and their drugs from other gangs. Gang members protected the "turf" of the Bottoms Boys' drug trafficking operation by promoting their image as the "toughest gang in Shreveport" and a force "not to be messed with." Under these

facts, a reasonable jury could find that violent retaliation for acts of disrespect promoted the goals of illegal enterprise.

Williams testified at trial that he was dissing the Bottoms Boys that night, refusing to flash the "down" sign and calling the gang the "Booty Boys." A jury could reasonably infer that, because of Miller's membership in the gang, he was required to respond violently to Williams's poor signing etiquette. *See United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996) (finding purpose element for VICAR offense satisfied by enterprise with policy of treating affronts to members as affronts to all and expecting violent retaliations by enterprise's members), *petition for cert. filed*, ___ U.S.L.W. ___ (Jan. 27, 1997) (No. 96-7692); *Fiel*, 35 F.3d at 1004 (finding that rational jury could conclude that defendants believed that participation in violent war against rival gang was expected of them by reason of their membership in gang); *United States v. Boyd*, 792 F. Supp. 1083, 1102 (N.D. Ill. 1992) (finding that purpose element is satisfied where government presented evidence that committing violent acts was one way to move up within the gang and that aversion to such acts would "invite trouble" from other gang members). Therefore we hold that a rational trier of fact could have found the essential elements of a VICAR offense beyond a reasonable doubt, and we uphold the convictions of Don Wilson and Patrick Miller on this count.

The jury also convicted Reginald Wilson of committing a VICAR

-16-

offense in the fatal shooting of Michael and Mitchell Henderson. For the same reasons articulated in this section, we find that the evidence was sufficient to convict Reginald Wilson for the VICAR count. However, as explained in Section VII.A *infra*, we vacate Wilson's conviction on this count for an independent reason, and we remand for a new trial.

B

We also reject all five defendants' challenges to their VICAR conspiracy convictions under Count One of the indictment.[2] In addition to the substantive VICAR offenses charged in the indictment, the government presented extensive testimony concerning violent acts committed by members of the Bottoms Boys. Howard Richardson testified to instances where customers were shot, stabbed, "snatched out of cars and beat," and "throwed to the dog"))a punishment in which gang members toss the offending individual over a fence into a yard with guard dogs. In addition, Richardson testified that rival gang members who came into the Bottoms without consent were beaten or shot. If anyone attacked a Bottoms Boy, gang members would organize a drive-by shooting in retaliation.

The evidence demonstrates that each defendant knew that

_____

The evidence is also sufficient to support Reginald Wilson's conviction for participation in the general VICAR conspiracy under count one, even though we vacate and remand his conviction for the substantive VICAR offense of count nine. *See* Section VII.A, *infra*.

-17-

commission of violent acts was expected of him by virtue of his membership in the gang and that each willingly joined the enterprise, thereby agreeing to commit those violent acts. For example, testimony established that Bottoms Boys were expected to retaliate against those who "dissed" the gang; that members regularly carried guns to protect the drug trade and that they often used those guns when drug deals went awry; and that Reginald Wilson and Sebastian Richardson, like Don Wilson, were "reapers" who regularly committed violent acts on behalf of the gang. In addition, testimony revealed that Brown, as the main supplier of the gang, paid Don Wilson to protect his person and his drugs, thus entering into an express agreement to commit violent crimes where necessary. We find that the evidence is sufficient for a rational jury to find that all the defendants conspired commit violent acts as an integral part of membership in the gang.

## IV
## SUFFICIENCY OF THE INDICTMENT

Richardson argues that count one of the indictment is fatally defective because it charges defendants with a crime that does not exist. Don Wilson, Brown, Reginald Wilson, and Patrick Miller join in this challenge by incorporation of Richardson's brief. Count one charges defendants with participation in a VICAR conspiracy under 18 U.S.C. § 1959(a)(5) and (6) by alleging that defendants "did knowingly combine, *conspire*, and confederate *to commit* murder, *attempted murder*, and assaults with dangerous weapons . . . in

violation of the laws of the State of Louisiana." (emphasis added). Defendants argue that "conspiracy to commit attempted murder" does not constitute a crime and thus the indictment is legally insufficient to support their convictions under count one.

We agree that "conspiracy to commit attempted murder" is not a cognizable offense under 19 U.S.C. § 1959, both as a matter of statutory construction and common sense. *United States v. Meacham*, 626 F.2d 503, 507-09 & n.7 (5th Cir. 1980) (holding that "conspiracy to attempt" is not offense under drug conspiracy statutes and noting that "it would be the height of absurdity to conspire to commit an attempt, an inchoate offense, and simultaneously conspire to fail at the effort"), *cert. denied*, 459 U.S. 1040, 103 S. Ct. 455, 74 L. Ed. 2d 608 (1982). However, we do not find that this drafting error warrants automatic reversal. Unlike in *Meacham*, the indictment here charged defendants with conspiracy to commit murder and assault with a deadly weapon, in addition to attempted murder. Although one of the objects of the conspiracy in count one fails to allege a cognizable offense, the other two objects are clearly sufficient under section 1959(a). Defendants do not allege that the indictment did not adequately apprise them of the charges against them or prejudice their defense in any way due to the inclusion of "attempted murder" as one of three possible objects. Our only concern is whether the jury convicted defendants of VICAR conspiracy based on a permissible

ground.

In *Yates v. United States*, the Supreme Court stated that, in the criminal context, "a verdict [must be] set aside where [it] is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."  354 U.S. 298, 312, 77 S. Ct. 1064, 1073, 1 L. Ed. 2d 1356 (1957), *overruled on other grounds*, *Burks v. United States*, 437 U.S. 1, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978).  The Court recently limited the *Yates* rule, distinguishing between legally and factually insufficient grounds for conviction.  A general verdict may stand where one of several objects of the conspiracy lacked adequate *evidentiary* support if the evidence was sufficient to support the other objects.  *Griffin v. United States*, 502 U.S. 46, 60, 112 S. Ct. 466, 474, 116 L. Ed. 2d 371 (1991).  However, where the verdict may have rested on a ground that, although supported by the evidence, was *legally* inadequate, the *Yates* rule still applies and the general verdict must be reversed.  *Id*. at 60, 112 S. Ct. at 474.

We find that the indictment for conspiracy to attempt in the instant case was both legally defective and factually unsupported by the evidence.  Because the government offered no proof at trial of a conspiracy to attempt, we find that there is no possibility that the jury convicted the defendants on the improper charge and that the plaintiffs were therefore not prejudiced by the legal error.  To the extent that the jury found the defendants guilty of

the conspiracy count, they must have based their conviction on the trial evidence of conspiracy to commit murder and assault with a deadly weapon.

We hold that *Griffin*, not *Yates*, applies where one of several charged objects of a conspiracy is factually insufficient, even if that object is also legally insufficient. Where, as in this case, no evidence was ever presented to support the legally flawed charge, there is little danger that the jury convicted on that impermissible ground. *See Griffin*, 502 U.S. at 58, 112 S. Ct. at 474 (noting that jurors are well equipped to analyze evidence and choose between factually sufficient and insufficient grounds). Thus, we reject the defendants' assertion that count one of the indictment is fatally defective.

## V
### *BRADY* CHALLENGES

Next, defendants raise two challenges concerning the government's execution of its duty to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed. 2d 215 (1963).

### A

Reginald Wilson contends that the government's failure to produce handwritten notes made by investigators during witness interviews violated his rights under the Jencks Act, 18 U.S.C. § 3500, and the Supreme Court's holding in *Brady*. Wilson requested production of the notes before trial, and all other defendants

-21-

adopt this argument by incorporation.  The government affirmatively stated that the notes existed, and the court ordered that the government produce them for *in camera* review.[3]  Later, during trial, defense counsel again requested that the court review the notes *in camera* to determine their *Brady* significance, and the court replied that it would.  However, the record does not reflect whether, or to what extent, the district court actually reviewed the notes in question or whether they contain *Brady* material.  The government did not brief this issue, nor did it adequately respond to direct questioning from this panel during oral argument.

Failure to disclose exculpatory evidence by the government is reversible only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial. *United States v. Bagley*, 473 U.S. 667, 678, 105 S. Ct. 3375, 3381, 87 L. Ed. 2d 481 (1985).  The Supreme court has held that favorable evidence is material, even when not requested by the defendant, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383 (opinion of Blackmun, J.); *id*. at 685, 105 S. Ct. at 3385 (White,

---

The district court did, in fact, review one set of notes taken during an interview with Rashaun Kimble, determined that they contained no *Brady* material, and filed them in the record under seal.  However, the government admitted that additional notes taken during other interviews existed, and the court ordered that these additional notes be produced for *in camera* review.

J., concurring in part and concurring in judgment).   The suppression of such material evidence only amounts to a *Brady* violation when, in the absence of such evidence, the verdict is unworthy of the court's confidence.  *Kyles v. Whitley*, 514 U.S. 419, ___, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995); *Bagley*, 473 U.S. at 678, 105 S. Ct. at 3381.

Because defendants do not have the notes in question, they are unable to claim a reasonable probability that information in the notes would undermine confidence in their verdicts, or that the notes contain any *Brady* material at all.  Although we will not ordinarily remand for *in camera* review based on purely speculative allegations of the existence of *Brady* material, *see United States v. Dinitz*, 538 F.2d 1214, 1224 (5th Cir. 1976), *cert. denied*, 429 U.S. 1104, 97 S. Ct. 1133, 51 L. Ed. 2d 556 (1977), the district court actually granted Wilson's request for *in camera* review and ordered production of the notes; we simply do not know the district court's conclusions or whether the government even complied with the court's request for the notes.

We therefore remand this matter so that the district court may supplement the record with its findings and the notes, under seal if necessary, if it has already reviewed their contents.  If the court has not yet reviewed the notes, then it should do so within the next thirty days, *in camera*, *nunc pro tunc*, to determine whether the notes contain any *Brady* material.  *United States v.*

-23-

*Thomas*, 12 F.3d 1350, 1365 (5th Cir.), *cert. denied*, 511 U.S. 1095, 114 S. Ct. 1861, 128 L. Ed. 2d 483 (1994), *and cert. denied*, 511 U.S. 1114, 114 S. Ct. 2119, 128 L. Ed. 2d 676 (1994). If the district court concludes that the notes contain no *Brady* material or that their suppression does not undermine confidence in the verdicts, it should supplement the record with the notes and make sufficiently detailed findings to enable us to review its decision. *Id.; United States v. Welch*, 810 F.2d 485, 491 (5th Cir.), *cert. denied*, 484 U.S. 955, 108 S. Ct. 350, 98 L. Ed. 2d 376 (1987). If defendants seek to challenge the district court's determination, they need not file a new appeal; they may instead file certified copies of the district court's findings and, if necessary, supplementary briefs or other materials for review by this panel. *Thomas*, 12 F.3d at 1365; *Welch*, 810 F.2d at 491. However, if the court finds that the notes contain *Brady* material that undermines confidence in any defendant's verdict, the court should vacate only the convictions that the notes call into doubt and grant a new trial for each. *Thomas*, 12 F.3d at 1365; *Welch*, 810 F.2d at 491.

### B

Sebastian Richardson argues that the government violated its *Brady* duty by failing to disclose that Richardson's brother, prosecution witness Howard Richardson, was taking the antipsychotic drugs Haldol, Lithium, and Elavil at the time of his testimony. Richardson's challenge, like Wilson's, has been adopted by all

-24-

other defendants.  Richardson asserts that failure to disclose this evidence severely hampered the defendants' ability to attack Howard's competence to testify.

Impeachment evidence, like exculpatory evidence, is subject to disclosure under *Brady*.  *Bagley*, 473 U.S. at 676, 105 S. Ct. at 3380.  However, to prevail under *Brady*, Richardson must first show that the prosecution violated a duty of disclosure.  *East v. Scott*, 55 F.3d 996, 1002 (5th Cir. 1995).  The government asserts that it was unaware that Howard Richardson had been prescribed anti-psychotic medication until after trial, and Sebastian Richardson does not suggest otherwise.  Although Richardson suggests that the government should be deemed to have had constructive knowledge based on a broad duty to investigate, a prosecutor has no duty under *Brady* to investigate the mental state of its witnesses in order to uncover impeachment evidence for the defense.  *East*, 55 F.3d at 1003-04.

## VI
### ADMISSION OF EVIDENCE AT TRIAL

Defendants argue that the district court erred in admitting into evidence a videotape made by gang members, as well as in admitting statements made by Sebastian Richardson to an undercover police officer.  We review a district court's evidentiary rulings for abuse of discretion.  *United States v. Vasquez*, 953 F.2d 176, 182 (5th Cir.), *cert. denied*, 504 U.S. 946, 112 S. Ct. 2288, 119 L. Ed. 2d 212 (1992).

-25-

During the investigation, the government confiscated a videotape made by one of the gang members showing other gang members, including many of the defendants, drinking, smoking marijuana, throwing gang signs, going on a "gangsta ride," firing weapons, threatening the police, and discussing drug transactions. The prosecution showed the so-called "Ford Park video" to the jury over the objections of Bellamy, Brown, and Reginald Wilson. On appeal, the defendants argue that the district court erred in admitting the tape under Fed. R. Evid. 403 because its extreme prejudice outweighed its probative value. In addition, they argue that statements made on the tape by gang members constituted inadmissible hearsay under Fed. R. Evid. 801.

The video, made by gang members for gang members, was highly probative of association for purposes of both the drug and VICAR conspiracies, and it corroborated the testimony of many of the government's witnesses. We cannot say that the district court abused its discretion in holding that the tape's prejudicial effect did not outweigh its probative value as to any defendant. Moreover, statements in the video made by gang members concerning drug transactions and guns were made in furtherance of the conspiracy and thus fall under the hearsay exception in Rule 801(d)(2)(E).

During the federal investigation, Special Agent Calvin Shivers

went undercover, telling Sebastian Richardson that he was a movie producer who needed ideas for a script about gangs. In response, Richardson thoroughly described the Bottoms Boys organization, which Shivers recorded on tape. Richardson even drew a diagram of how the drug distribution network was organized. In the process, Richardson named Alfred Brown as the "man with the sac [sic]" at the top of the organizational chart. The government enlarged this exhibit to poster size for introduction at trial and, over the objection of defense counsel, closed its case with Agent Shivers's testimony detailing Richardson's description of how the gang operates. The court sustained defendants' objection that Richardson's statements did not fall within the co-conspirator exception of Fed. R. Evid. 801(d)(2)(E) because they were not made in furtherance of the conspiracy. The court therefore admitted the statements for use against Richardson only as admissions of a party-opponent under Rule 801(d)(2)(A) and gave a limiting instruction to that effect. However, the government repeatedly referred to the chart in closing as evidence against all defendants and against Brown specifically, referring to him as the "man with the sack."

Defendants argue that the introduction of this testimony and exhibit violated their rights under the Confrontation Clause of the Sixth Amendment. Richardson's statements to Agent Shivers were not made in furtherance of the conspiracy and were therefore inadmissible against any defendant other than Richardson. A

-27-

district court violates a defendant's Sixth Amendment right of confrontation when, in a joint trial, it admits a nontestifying defendant's extrajudicial statement implicating another defendant in the crime. *Bruton v. United States*, 391 U.S. 123, 126, 88 S. Ct. 1620, 1622, 20 L. Ed. 2d 476 (1968). However, *Bruton* does not come into play "unless a co-defendant's statement directly alludes to the complaining defendant," even if it is apparent that "the defendant was implicated by some indirect reference." *United States v. Cartwright*, 6 F.3d 294, 300 (5th Cir. 1993), *cert. denied*, 513 U.S. 1060, 115 S. Ct. 671, 130 L. Ed. 2d 604 (1994). Richardson mentioned only Alfred Brown by name, and did not refer to any other defendant specifically, thus the *Bruton*/Confrontation Clause arguments of all other defendants fail.

However, as to Brown, *Bruton* is plainly implicated. Brown could not cross-examine Richardson to determine the veracity of the statements made or to reveal whether Richardson was merely "puffing" to impress Agent Shivers. A limiting instruction by the court in such a case is insufficient to remedy the constitutional violation. *Cruz v. New York*, 481 U.S. 186, 193-94, 107 S. Ct. 1714, 1719, 95 L. Ed. 2d 162 (1987) ("[W]here a nontestifying codefendant's confession incriminating the defendant is not directly admissible against the defendant, the Confrontation Clause bars its admission at their joint trial, even if the jury is instructed not to consider it against the defendant, and even if

the defendant's own confession is admitted against him.") (citations omitted); *United States v. Jobe*, 101 F.3d 1046, 1067 (5th Cir. 1996) (holding that limiting instruction cannot rectify actual *Bruton* error, but finding no such error).

We therefore find that admission of this uncorroborated evidence, even with a limiting instruction, was an abuse of discretion. Furthermore, the district court abused its discretion in overruling defendants' objection to the government's misuse of the sting evidence during its closing. The prosecutor's arguments at closing were patently impermissible given the limited purposes for which the court admitted the evidence. *See United States v. Flores-Chapa*, 48 F.3d 156, 159-61 (5th Cir. 1995) (overturning conviction where prosecutor had repeated hearsay testimony at closing argument, despite two previously sustained objections to testimony at trial). The prosecutor's use of such evidence against Brown violated his constitutional rights under the Confrontation Clause.

Upon a showing of the denial of a constitutional right, we must reverse a conviction unless the error is harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24-25, 87 S. Ct. 824, 827-28, 17 L. Ed. 2d 705 (1967). A *Bruton* error is harmless where the weight of other evidence clearly implicates the defendant. *Jobe*, 101 F.3d at 1067; *United States v. Kelly*, 973 F.2d 1145, 1150 (5th Cir. 1992). The record is filled with in-

court testimony of Brown's involvement in the conspiracy as an "O.G." and as its major supplier. Both Howard Richardson and John Palmer testified that Brown made trips to Houston to buy cocaine that he would then distribute among gang members. Other witnesses link Brown as a direct or indirect supplier to all of the other defendants. In light of the abundant independent evidence of guilt, Richardson's chart and description were merely cumulative. Therefore, we find that the *Bruton* error was harmless beyond a reasonable doubt.

## VII
### CHALLENGES BASED ON THE SHOOTINGS OF THE HENDERSON TWINS

#### A

Reginald Wilson contends that the district court erred in denying his motion to sever his trial from that of his co-conspirators, because his co-defendants were the only witnesses who could verify his VICAR defense, that he killed the Henderson twins in self-defense. Wilson confessed to gunning down the twins as they sat in their car but claims that he fired only after seeing one of the twins reach for a weapon. Police later found a semiautomatic pistol in the twins' car. Although counsel laid a foundation for the self-defense theory in opening argument, Wilson did not call any witnesses to support his theory. The jury rejected Wilson's claim of self-defense and convicted him of committing a violent crime in aid of racketeering under 18 U.S.C. § 1959 and using a firearm during a crime of violence under 18

U.S.C. § 924(c).

At the conclusion of the trial, the government stipulated that co-defendants Sebastian Richardson, Alonzo Bates, and Alfred Brown would have corroborated Wilson's self-defense testimony. The government further stipulated that, if those defendants had actually been called to testify as witnesses at the joint trial, they would have asserted their constitutional right against self-incrimination under the Fifth Amendment. Wilson contends that the court's failure to sever his trial deprived him of the corroborating testimony of co-defendants.

We review for abuse of discretion the district court's decision to try defendants jointly, *United States v. Neal*, 27 F.3d 1035, 1044-45 (5th Cir. 1994), *cert. denied*, 513 U.S. 1008, 115 S. Ct. 530, 130 L. Ed. 2d 433 (1994), and to deny a motion for new trial. *Jobe*, 101 F.3d at 1057. The Supreme Court has held that "a defendant might suffer prejudice if essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 938, 122 L. Ed. 2d 317 (1993). To make such a showing, Wilson must demonstrate a *bona fide* need for the co-defendants' testimony, the substance of their testimony, the exculpatory nature and effect of such testimony, and that the co-defendant would in fact testify. *Neal*, 27 F.3d at 1047. We think that Wilson, with the help of the government's stipulations, has done this. The co-

defendants were all eyewitnesses to the shooting, and the government stipulated at trial that those witnesses would verify Wilson's account, which would be exculpatory evidence.

The government contends that there was no *bona fide* need for the testimony of co-defendants. There were six additional eyewitnesses to the shooting who were not on trial that Wilson could have called to testify. However, Wilson claims that only his co-defendants were in a position to see the twins reach for a weapon. Wilson claims that his co-defendants would testify to this very fact; each gave a statement to the police shortly after the shooting that corroborates Wilson's account. The government has stipulated that the co-defendants' testimony would be exculpatory. Under these circumstances, we vacate Wilson's conviction on count nine and remand for new trial.[4]

The jury also convicted Wilson under 18 U.S.C. § 924(c), for using a firearm during and in relation to this federal VICAR offense. However, because the firearm conviction depends on the commission of another crime, the government cannot convict Wilson under section 924(c) unless he has been convicted of the underlying VICAR offense. Because we have remanded Wilson's conviction for

---

Donald Miller, Dexter Chambers, and Roderick Allen also alleged that the district court abused its discretion by failing to try them separately from their co-conspirators. We find their claims, individually and to the extent incorporated by other defendants, to be without merit. *See United States v. PeÁa-Rodriguez*, 110 F.3d 1120, 1129 (5th Cir. 1997) (finding no abuse of discretion in refusing to sever where culpability of each defendant was clearly and distinctly proven and thus there was no danger that criminal acts of some would be carried over to others).

the underlying federal crime, we vacate his derivative conviction under section 924(c) in count ten and remand for a new trial.

B

Richardson and Brown argue that the district court erred in calculating their base offense levels for the VICAR conspiracy conviction using the offense level for second-degree murder under U.S.S.G. § 2A1.2 rather than the alternative minimum base offense level provided in section 2E1.3.[5] The district court applied the higher offense level based on statements made by Richardson and Brown to police following the shooting of the Henderson twins by Reginald Wilson. Specifically, Richardson and Brown told police that one of the twins reached for what they thought was a gun immediately before Wilson shot them. The Caddo Parish District Attorney decided not to prosecute Wilson, partly on the basis of Richardson's and Brown's statements.

Richardson's and Brown's presentence reports ("PSRs"), which were adopted by the district court, found that their statements were inconsistent with the ultimate jury verdict, which rejected Wilson's claim of self-defense. On this ground alone, the PSRs concluded that Richardson and Brown had lied in furtherance of the VICAR conspiracy and that their statements to police were relevant conduct linking them to the murder of the Hendersons.

---

U.S.S.G. § 2E1.3 governing VICAR offenses instructs the court to impose a base offense level of twelve or the base offense level applicable to the underlying offense, whichever is greater.

Where the defendant objected to the determination of relevant conduct at sentencing, we review the district court's findings of fact for clear error. *United States v. Sneed*, 63 F.3d 381, 389 (5th Cir. 1995), *cert. denied*, ___ U.S. ___, 116 S. Ct. 712, 133 L. Ed. 2d 667 (1996). Richardson objected to the PSR's findings at sentencing; Brown, however, did not. At sentencing, the district court specifically ruled that, although it would consider motions by one defendant to be adopted by all, defendants could not rely on their co-defendants' objections to the PSRs. Therefore, we will review the district court's findings of fact with respect to Brown for plain error only. *United States v. Vital*, 68 F.3d 114, 118-19 (5th Cir. 1995). Under Fed. R. Crim. P. 52(b), an error is plain only when (1) there is an error, (2) the error is clear or obvious, and (3) the error affects the substantial rights of the defendant. *United States v. Olano*, 507 U.S. 725, 731-37, 113 S. Ct. 1770, 1776-79, 123 L. Ed. 2d 508 (1993); *United States v. Calverley*, 37 F.3d 160, 162-64 (5th Cir.) (en banc), *cert. denied*, ___ U.S. ___, 115 S. Ct. 1266, 131 L. Ed. 2d 145 (1995). If these factors are established, we have the discretion to correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. *Vital*, 68 F.3d at 119.

Because we vacate the jury's verdict with respect to Wilson's VICAR conviction for the shootings of the Henderson twins, the sole basis for the district court's determination that Richardson and

-34-

Brown lied to police, evaporates.  The district court plainly erred in resting its factual findings with respect to sentencing on a verdict that we have subsequently found to be infirm, and we find that Richardson's and Brown's substantial rights were prejudiced by this error.[6]  We therefore vacate both Richardson's and Brown's sentences on count one and remand to the district court.  The court may either postpone sentencing subject to Reginald Wilson's new trial, or make additional findings of fact, unrelated to the shooting of the twins, regarding the VICAR conspiracy conviction of count one.

C

Reginald Wilson contends that one of the jurors was biased against him because the juror was a friend of the Henderson twins, who Wilson admits to having killed.  After trial, counsel for Wilson acquired affidavits from two people who claimed that juror Ricky Lewis was a friend of Michael and Mitchell Henderson.  During *voir dire*, the court read the potential jurors a list of names and asked if the names were familiar; the names of the twins were not on the list, and Lewis truthfully replied that none of the names was familiar to him.  Wilson claims that the court would have

---

Although "[q]uestions of fact capable of resolution by the district court upon proper objection at sentencing can never constitute plain error," *United States v. Lopez*, 923 F.2d 47, 50 (5th Cir.), *cert. denied*, 500 U.S. 924, 111 S. Ct. 2032, 114 L. Ed. 2d 117 (1991), the district court's fact determinations depended on an erroneous legal conclusion, *i.e.*, that the jury verdict against Reginald Wilson was constitutionally sound.  Therefore, we decline to apply the *Lopez* rule in this case.

removed Lewis for cause had it learned that Lewis knew the twins, or else Wilson would have exercised one of his peremptory strikes against him.  Wilson also claims that the court erred in failing to order a hearing at which Wilson could have shown actual bias.  *See Smith v. Phillips*, 455 U.S. 209, 215, 102 S. Ct. 940, 945, 71 L. Ed. 2d 78 (1982) ("This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias."); *United States v. Scott*, 854 F.2d 697, 698 (5th Cir. 1988) (same).  Wilson suggests that the district court's refusal to conduct a hearing denied him his constitutional right to a fair trial.

Motions for new trial and decisions regarding jury bias are traditionally within the discretion of the trial court.  *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S. Ct. 845, 850, 78 L. Ed. 2d 663 (1984) (plurality opinion).  Therefore we review the district court's denial of the motion for new trial for abuse of discretion.  *United States v. Buckhalter*, 986 F.2d 875, 879 (5th Cir.), *cert. denied*, 510 U.S. 873, 114 S. Ct. 203, 126 L. Ed. 2d 160 (1993).

Generally, to obtain a new trial for jury bias, a party must demonstrate (1) that a juror failed to answer honestly a material question during *voir dire*, and (2) that a correct response would have provided the basis for a successful challenge for cause. *McDonough*, 464 U.S. at 556, 104 S. Ct. at 850; *Scott*, 854 F.2d at

698 (applying *McDonough* in the criminal context). We have applied the plurality opinion in *McDonough* as binding precedent in juror bias cases in this circuit. *Montoya v. Scott*, 65 F.3d 405, 418 n.24 (5th Cir. 1995), *cert. denied*, ___ U.S. ___, 116 S. Ct. 1417, 134 L. Ed. 2d 542; *United States v. Ortiz*, 942 F.2d 903, 909 (5th Cir. 1991), *cert. denied*, 504 U.S. 985, 112 S. Ct. 2966, 119 L. Ed. 2d 587. Unlike in *McDonough*, there is no evidence that Lewis lied or actively concealed information during *voir dire*; Wilson simply failed to request that the court pose the relevant questions to the venire. Therefore the traditional *McDonough* framework is inapplicable to this case. *See United States v. Collins*, 972 F.2d 1385, 1403 (5th Cir. 1992) (refusing to apply *McDonough* test where there was no allegation that juror concealed a material fact), *cert. denied*, 507 U.S. 1017, 113 S. Ct. 1812, 123 L. Ed. 2d 444 (1993); *cf. McDonough*, 464 U.S. at 558-59, 104 S. Ct. at 851 (Brennan, J. concurring) (noting that question of juror bias is quite independent of determination of whether potential juror lied during *voir dire*).

Wilson did not request that the district court ask whether any of the potential jurors knew any of the victims, nor did he otherwise object to the adequacy of *voir dire*. "A disqualification which by reasonable diligence could have been discovered before verdict, may not afterwards be made the subject of an attack upon a verdict." *Spivey v. United States*, 109 F.2d 181, 186 (5th Cir.),

-37-

*cert. denied*, 310 U.S. 631, 60 S. Ct. 1079, 84 L. Ed. 1401 (1940); *see also Ford v. United States*, 201 F.2d 300, 301 (5th Cir. 1953) ("It is the right and duty of a defendant to discover on *voir dire* examination . . . whether a [venireperson] is subject to disqualification for cause" and objection is "ordinarily waived by failure to assert it until after verdict, even though the facts which constitute the disqualification were not previously known to the defendants"); *Robinson v. Monsanto*, 758 F.2d 331, 335 (8th Cir. 1985) (finding that right to challenge juror is waived if basis for objection might have been discovered during *voir dire* had party requested appropriate line of questioning). Wilson bears the burden of proving that the belated discovery of Lewis's friendship with the victims was not due to lack of diligence on his part. *United States v. Jones*, 597 F.2d 485, 488 (5th Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S. Ct. 729, 62 L. Ed. 2d 728 (1980). Wilson has not satisfied his burden. He simply asserts that Lewis failed to honestly respond to questioning at *voir dire* without specifying which question or questions he failed to properly answer. Wilson does not address his own failure to request that the court include Michael and Mitchell Henderson on the list of names read to the jury.

Since Wilson's failure to uncover the new evidence of potential bias stems from his own neglect, we will reverse the district court's denial of new trial only if Wilson can show that

-38-

Lewis was actually biased against him. *Ford*, 201 U.S. at 301 (stating that failure to challenge juror until after verdict waives the objection unless defendant shows actual prejudice or fundamental incompetence); *cf. United States v. Gray*, 105 F.3d 956, 962 (5th Cir. 1997), *cert. denied*, ___ U.S. ___, 117 S. Ct. 1326, ___ L. Ed. 2d ___ (1997) (applying plain error analysis where defendants failed to object to manner in which court conducted *voir dire*); *United States v. Brown*, 26 F.3d 1124, 1126-27 (D.C. Cir. 1994) (applying plain error analysis to claim of juror bias not raised at trial); *United States v. Uribe*, 890 F.2d 554, 560 n.4 (1st Cir. 1989) (same). We presume that the jury was impartial, and Wilson has the burden of proving otherwise by a preponderance of the evidence. *Collins*, 972 F.2d at 1403; *McDonough*, 464 U.S. at 558-59, 104 S. Ct. at 851 (Brennan, J. concurring).

Wilson seems to argue that we may imply bias as a matter of law from Lewis's relationship with the victims. *See Phillips*, 455 U.S. at 221-24, 102 S. Ct. at 948-49 (O'Connor, J. concurring) (offering examples of situations where bias might be implied); *United States v. Wood*, 299 U.S. 123, 133, 57 S. Ct. 177, 179, 81 L. Ed. 78 (1936) (noting that bias may be either actual or implied). However, friendship with the victim of a defendant's alleged crime does not, standing alone, justify a finding of bias. *Cf. Montoya*, 65 F.3d at 420 ("Although such knowledge [of the victim] may be the source of an existing bias, 'the mere fact that a juror knows, or

is a neighbor, or an intimate acquaintance of, and on friendly relations with, one of the parties to a suit, is not sufficient basis for disqualification.'") (citations omitted); *Howard v. Davis*, 815 F.2d 1429, 1431 (11th Cir.) (holding that district court did not abuse its discretion by refusing to excuse juror who had been "close friend" of victim), *cert. denied*, 484 U.S. 864, 108 S. Ct. 184, 98 L. Ed. 2d 136 (1987); *United States v. Freeman*, 514 F.2d 171, 173-74 (8th Cir. 1975) (finding no abuse of discretion in failing to excuse juror who knew victim's family). Wilson has not demonstrated, on the basis of the affidavits alone, that Lewis was actually biased against Wilson.

We furthermore reject Wilson's contention that the district court erred in denying his motion for new trial without conducting an evidentiary hearing at which he could prove such bias. In his motion for new trial, Wilson specifically advised the district court that an evidentiary hearing was unnecessary. Wilson may not claim error in the denial of a remedy that he explicitly disclaimed. On the unusual facts of this case, we find no abuse of discretion in the district court's denial of Wilson's motion for new trial or for an evidentiary hearing.

VIII
DON WILSON

A

Don Wilson contends that counts two and three of the indictment charged him twice for the same offense under the Double

Jeopardy Clause of the Fifth Amendment. Count two of the indictment charged him with participation in a drug conspiracy under 21 U.S.C. § 846, and count three charged him with engaging in a continuing criminal enterprise ("CCE") under 21 U.S.C. § 848. The jury convicted Wilson on both counts. The Supreme Court recently ruled that conspiracy under section 846 is a lesser included offense of CCE under section 848, and that conviction under both statutes constitutes unconstitutional double jeopardy. *Rutledge v. United States*, ___ U.S. ___, 116 S. Ct. 1241, 1247, 134 L. Ed. 2d 419 (1996). The government concedes that Wilson's section 846 conviction should be vacated on double jeopardy grounds. We therefore vacate Wilson's conviction for drug conspiracy in count two of the indictment.

B

Next, Don Wilson challenges his CCE conviction under 21 U.S.C. § 848. To show a CCE violation, the government must prove that Wilson organized, supervised or managed five or more persons in a continuing series of drug violations (at least three) from which he obtained substantial income. *Garrett v. United States*, 471 U.S. 773, 786, 105 S. Ct. 2407, 2415, 85 L. Ed. 2d 764 (1985).[7] The five people involved in the CCE need not have acted in concert or

---

Wilson argues that the jury must unanimously agree on which three substantive offenses constitute the continuing series of drug violations and the failure to so instruct the jury constitutes reversible error. We have never held that such an instruction is required and do not address the question here since Wilson failed to request a specific instruction or object to the charge given.

at the same time. *United States v. Phillips*, 664 F.2d 971, 1034 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S. Ct. 2965, 73 L. Ed. 2d 1354 (1982). The defendant need not have been the sole or dominant organizer or manager of the enterprise. *United States v. Tolliver*, 61 F.3d 1189, 1215-16 (5th Cir, 1995), *vacated on other grounds*, *Sterling v. U.S.*, ___ U.S. ___, 116 S. Ct. 900, 133 L. Ed. 2d 834 (1996). Nor need he have directly or personally organized, supervised, or managed five people, *United States v. Hinojosa*, 958 F.2d 624, 630 (5th Cir. 1992), or even have had personal contact which each underling. *Tolliver*, 61 F.3d at 1216. "Thus, the requisite associations and relationships may be found even in loosely structured enterprises." *Id.*

1

Wilson argues that the evidence was insufficient to prove that he had a managerial or supervisory role in the drug trafficking organization. In particular, he argues that although the evidence establishes that he was a leader in the gang, it does not establish that he directed the drug dealing activities of at least five different people or that he did anything other than front drugs to gang members. Wilson cites *United States v. Witek*, 61 F.3d 819, 822, 824 (11th Cir. 1995), *cert. denied*, ___ U.S. ___, 116 S. Ct. 738, 133 L. Ed. 2d 688 (1996), for the proposition that a mere buyer-seller relationship is insufficient to support a CCE conviction.

-42-

The government, however, cites to evidence in the record that shows that Wilson occupied more than a mere buyer-seller relationship with other members of the Bottoms Boys. Testimony at trial indicates that Wilson was one of six "O.G.s," and that, as a leader of the gang, he controlled both the membership of the organization and the identities of the sellers on the gang's "turf" who numbered far more than five. We agree that from this evidence, a rational jury could reasonably infer that Wilson was an organizer and manager of the drug-selling operation and all of its members.

2

Second, Wilson argues that the government failed to show that he derived substantial income from the enterprise. In particular, he argues that the government must present evidence of specific amounts earned from the conspiracy; it is not enough for the government to offer generalized testimony that Wilson had "a lot" of cars and that he was seen with "a lot" of money. We disagree. The government need not specifically trace the source of income to the drug trade or show specific amounts. In fact, the jury may infer substantial income from outward evidence of wealth in the absence of other, legitimate sources of income. *United States v. Chagra*, 669 F.2d 241, 257 (5th Cir.), *cert. denied*, 459 U.S. 846, 103 S. Ct. 102, 74 L. Ed. 2d 92 (1982), *overruled on other grounds*, *Garrett v. United States*, 471 U.S. 773, 105 S. Ct. 2407, 85 L. Ed. 2d 764 (1985).

-43-

The government presented evidence that Wilson owned approximately eleven cars, including three or four Cadillacs, and had a ready supply of drugs. However, Wilson had no legitimate employment or other source of income. Furthermore, there was testimony that Wilson earned thousands of dollars selling drugs that he stashed in vacant houses. Therefore, viewing the evidence in the light most favorable to the verdict, we find that the evidence was sufficient to support a CCE conviction.

IX
ALFRED BROWN

A

Count twenty-three of the indictment charged Alfred Brown with possessing cocaine base with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), "[o]n or about February 9, 1992." Count twenty-four charged him with using and carrying a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1), also "[o]n or about February 9, 1992." The proof at trial, however, demonstrated that the events supporting the indictment occurred on July 9, 1992, the date on which Brown was arrested for the substantive offense of possession of cocaine with intent to distribute. Moreover, the evidence demonstrated that the substance in Brown's possession on that date was cocaine hydrochloride, or powder cocaine, not cocaine base as alleged in the indictment. Brown asserts that these variances are fatal to his convictions on these counts.

-44-

The district court correctly instructed the jury that, by alleging that the offense occurred "on or about" February 9, 1992, the government need only show that the crime was committed reasonably near that date. *Phillips*, 664 F.2d at 1036; *United States v. Grapp*, 653 F.2d 189, 195 (5th Cir. Unit A 1981). A five-month variance between the date alleged and the date proved is not unreasonable as a matter of law as long as the date proven falls within the statute of limitations and before the return of the indictment. *Phillips*, 664 F.2d at 1036. *See also United States v. Harrell*, 737 F.2d 971, 981 (11th Cir. 1984) (upholding conviction where indictment alleged that offense occurred in February 1980 but proof showed that offense occurred during the summer of 1980), *cert. denied*, 469 U.S. 1164, 105 S. Ct. 923, 83 L. Ed. 2d 935 (1985).

Moreover, a variance between allegations and proof is fatal "only when it affects the substantial rights of the defendant by failing to sufficiently notify him so that he can prepare his defense and will not be surprised at trial." *Phillips*, 664 F.2d at 1036. Brown cannot demonstrate that he was surprised or prejudiced in any way by the February 9, 1992, date in the indictment. Brown knew that he was arrested on July 9 for possession of cocaine with intent to distribute. In fact, it was Brown's attorney who brought the error in the indictment to the attention of the prosecutor shortly after Brown's arrest in

September of 1994, several months before trial.  Moreover, Brown filed a motion to suppress evidence gathered on July 9, 1992, thus demonstrating that he was aware of and was fully prepared to defend against the government's allegations with respect to Brown's arrest on July 9.

Furthermore, although the indictment incorrectly alleged that the substance seized from Brown was cocaine base (crack) rather than cocaine hydrochloride, the particular form of the cocaine is not an element of the offense under section 841(a)(1) and is thus immaterial to a conviction.  The jury need only have found that the substance was some form of cocaine and thus a controlled substance. *United States v. Deisch*, 20 F.3d 139, 151 (5th Cir. 1994). Moreover, for the same reasons stated above, Brown cannot demonstrate that he was prejudiced in any way by the error in the indictment.

B

Brown next argues that the jury could not have concluded from the small amount of cocaine seized that Brown possessed the drugs with intent to distribute.  However, we agree with the government that the evidence is sufficient to support the conviction. Witnesses testified that Brown purchased large amounts of cocaine in Houston for distribution in the Bottoms, and investigators observed numerous drug transactions involving Brown's Cadillac throughout the day on July 9, 1992.  The fact that police seized

only .1 grams of cocaine at the end of the day is not inconsistent with possession with intent to distribute.

C

Next, Brown argues that the evidence is insufficient to support the allegation in count twenty-four that he used a firearm during and in relation to a drug trafficking crime. In *Bailey v. United States*, ___ U.S.___,___, 116 S. Ct. 501, 133 L. Ed. 2d 472 (1995), decided after Brown's conviction, the Supreme Court held that section 924(c)(1) requires evidence sufficient to show active employment of a firearm by the defendant, not mere possession or intended use. *Id*. at 505-09. *Bailey* applies retroactively to this appeal. *United States v. Rivas*, 85 F.3d 193, 195 n.1 (5th Cir.), *cert. denied*, ___ U.S. ___, 117 S. Ct. 593, 136 L. Ed. 2d 521 (1996).

While we agree that the evidence is insufficient to prove that Brown "used" a firearm, the indictment charged him with both using *and* carrying firearms under section 924(c). The government need not prove that Brown both used *and* carried the firearms seized; a showing that he *carried* a firearm during and in relation to his drug trafficking crime would suffice. A "disjunctive statute may be pleaded conjunctively and proved disjunctively." *United States v. Dickey*, 102 F.3d 157, 164 n.8 (5th Cir. 1996) (citation omitted). *Bailey* did not address the "carrying" requirement of the statute; thus previous precedent with respect to that prong remains

unaffected.  *Rivas*, 85 F.3d at 195.

We have held that "the 'carrying' requirement of § 924(c) is met 'if the operator of the vehicle knowingly possesses the firearm in the vehicle during and in relation to a drug trafficking crime.'"  *Id.* (quoting *United States v. Pineda-Ortuno*, 952 F.2d 98, 104 (5th Cir.), *cert. denied*, 504 U.S. 928, 112 S. Ct. 1990, 118 L. Ed. 2d 587 (1992)).  At the time of Brown's arrest for drug possession, police found a firearm next to the driver's seat of Brown's car and another in the trunk.  The evidence was sufficient for the jury to find that Brown "carried" a firearm for the purposes of section 924(c).  *See United States v. Brown*, 102 F.3d 1390, 1401 (5th Cir. 1996) (finding evidence sufficient for "carrying" prong where defendants had gun in van while transporting drugs), *cert. denied*, ___ U.S. ___,  117 S. Ct. 1455, ___ L. Ed. 2d ___ (1997); *United States v. Fike*, 82 F.3d 1315, 1328 (5th Cir.) (finding evidence supported "carrying" where defendant had gun in car within reach during drug transaction), *cert. denied*, ___ U.S. ___, 117 S. Ct. 241, 136 L. Ed. 2d 170 (1996).

The district court instructed the jury that it must find that Brown "knowingly used or carried a firearm" and that the firearm "was an integral part of the drug offense charged."  The court did not otherwise define "use" or "carry" except to instruct that the government need not prove that a defendant "actually fired the weapon or brandished it at someone in order to prove use . . . ."

We recognize that, after *Bailey*, this is no longer a correct statement of the law. *Bailey*, ___ U.S. at ___, 116 S. Ct. at 507.

However, we note that this erroneous instruction is not harmful *per se*. The jury did not specify whether it found Brown guilty of use or carrying of the weapon in this case; however, we have established that there is sufficient evidence to show that he carried the weapon in his car.[8] Based on these facts, we infer that the jury could not have improperly convicted Brown for a "use" that would not also support a proper conviction for carrying a weapon. We find that the erroneous instruction was harmless; therefore automatic reversal in this case makes little sense.

We are nevertheless constrained by our own precedent to vacate Brown's conviction. In both *Brown* and *Fike*, we held that a defendant's conviction must be vacated and remanded for a new trial on the "carrying" prong alone where the district court instructed the jury under the liberal, pre-*Bailey* definition of "use." *Brown*, 102 F.3d at 1401; *Fike*, 82 F.3d at 1328. *Brown* and *Fike* are factually indistinguishable from this case in all relevant respects and are therefore binding; we have long insisted that one panel of the court may not overrule another panel because it disagrees with its holding. *Montesano v. Seafirst Commercial Corporation*, 818

---

It is possible, of course, under a different set of facts, to conceive of a theory of passive "use" under the erroneous instruction that would not support a conviction under the "carry" prong))for example, where police find a gun in close proximity to drugs in a bedroom closet, as they did in *Bailey*. However, there was no evidence introduced against Brown in this case to support such an improper conviction for "use."

F.2d 423, 425-26 (5th Cir. 1987). Therefore, barring *en banc* reconsideration of the issue or an intervening Supreme Court decision, we must vacate Brown's section 924(c) conviction and remand the count for retrial on the carry prong alone.

D

At trial, the government called Jacqueline English, Brown's longtime companion, as a witness. English denied having any knowledge of Brown's alleged drug sales or his purchasing trips to Houston and denied that she had ever discussed such matters during an interview with FBI agent Dan McMullen in September 1994. After English stepped down, the government called Agent McMullen to the stand but promptly released him without questioning.

In his closing, Brown's attorney argued that the only logical conclusion that the jury could draw from Agent McMullen's failure to testify was that McMullen's testimony would not have helped the government's case. During rebuttal, the government responded to these allegations by stating, over counsel's objection:

> The rules of evidence do not allow the Government to call the agent to impeach her. I called him and then I realized I could not by the rules of evidence. I am prohibited by the rules of evidence from doing that. So that's why we call [sic] him back. It's a rule of evidence, it's a legal rule of evidence that kept Agent McMullen off the stand.

Brown argues that the prosecutor's statements impermissibly suggested to the jury that otherwise inadmissible evidence existed that would rebut English's testimony.

We have previously held that the government may not seek to impeach a witness with evidence not in the record by suggesting that, but for the rules of evidence, such proof would have been presented at trial. *United States v. Vaglica*, 720 F.2d 388, 394-95 (5th Cir. 1983) (finding error in permitting prosecutor to argue that, but for rules of evidence, government would have been able to rebut defendant's testimony); *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978) ("This Court has repeatedly held . . . that an attorney may not say anything to the jury implying that evidence supporting the attorney's position exists but has not been introduced in the trial."). Such comments may constitute error even if merely responsive to comments by defense counsel. *United States v. Diaz*, 662 F.2d 713, 717 (11th Cir. 1981).

However, even assuming *arguendo* that the prosecutor's statements were improper, the error was harmless. *See Morris*, 568 F.2d at 402 (holding that prosecutor's statements "must be regarded as harmless if, upon examination of the entire record, substantial prejudice to the defendant does not appear"); *United States v. Diaz-Carreon*, 915 F.2d 951, 956 (5th Cir. 1990) ("Improper prosecutorial comments require reversal only if the comments substantially affected the defendant's right to a fair trial."). The record is replete with evidence of Brown's involvement in the conspiracy as its major drug supplier. English did not testify that any of the evidence against Brown was false or that Brown was

actually innocent; she simply denied having any knowledge of his drug trafficking activity. Her impeachment, even by impermissible means, was immaterial to Brown's conviction. We therefore find that the prosecutor's comments at closing were harmless. *See United States v. Lester*, 749 F.2d 1288, 1302 (9th Cir. 1984) (finding similar error harmless in light of overwhelming evidence of guilt); *cf. Vaglica*, 720 F.2d at 395 (finding reversible error where prosecutor implied that, but for rules of evidence, it could rebut primary evidence supporting defense).

X
SEBASTIAN RICHARDSON

A

Sebastian Richardson argues that the district court erred in denying his motion for new trial on the drug distribution charge in count twenty-two. The decision to grant or deny a motion for new trial based on the weight of the evidence is within the sound discretion of the trial court. An appellate court may reverse only if it finds the decision to be a "clear abuse of discretion." *United States v. Dula*, 989 F.2d 772, 778 (5th Cir.), *cert. denied*, 510 U.S. 859, 114 S. Ct. 172, 126 L. Ed. 2d 131 (1993). The court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable. *United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997). Rather, the evidence must weigh heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand.

-52-

*Id.*

Richardson argues that the weight of the evidence shows that the government informant, Mary Gladney, mistook Roderick Allen for Richardson during a drug purchase and that Deputy Carl Townley misidentified Richardson's voice on the tape of that transaction. Specifically, Richardson points to testimony by Gladney that the person from whom she purchased the drugs was bald, although Richardson was not bald on the day in question, and testimony that Allen, who was bald, sometimes answered to Richardson's nickname "Bam Bam."

We find that this is an isolated inconsistency in testimony that the jury could reasonably find did not call into question other inculpatory evidence. Both witnesses were subjected to extensive cross-examination concerning the identification of Richardson. Townley testified that he had known Richardson for years and could recognize his voice. Although Gladney testified that the seller was bald, her testimony indicated that she had not been concentrating on his appearance at the time. The jury could easily have concluded beyond a reasonable doubt that the seller responding to the name "Bam Bam" was Richardson. Where the defense had ample opportunity to attack the reliability of a witness at trial, but the jury chose to credit that testimony anyway, the district court did not abuse its discretion in denying the motion for new trial. *Dula*, 989 F.2d at 778.

B

At trial, former gang member Rashaun Kimble testified that he, Richardson, and Richard Pea (a.k.a. "Posse") participated in a "walk-by" shooting. The government cited the testimony as evidence of Richardson's involvement in the VICAR conspiracy. During trial, a defense investigator interviewed Pea, who stated that he had never been involved in such a shooting with Kimble and Richardson. After trial, Pea signed an affidavit swearing that Kimble had tried to persuade Pea to lie about his involvement because Kimble "was pressed to come up with the name of a third party to make the story believable." Richardson contends that the district court should have granted his motion for a new trial based on this newly discovered evidence.

To receive a new trial under Fed. R. Crim. P. 33 Richardson must prove that: "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence introduced at a new trial would probably produce an acquittal." *United States v. Jaramillo*, 42 F.3d 920, 924 (5th Cir. 1995), *cert. denied*, ___ U.S. ___, 115 S. Ct. 2014, 131 L. Ed. 2d 1013 (1995). The motion must be denied if all elements of the test are not satisfied. *Id*. at 924-25. The evidence at issue here is not "newly discovered" since

Pea stated in the affidavit that he offered this information to the defense investigator at the time of the initial interview during the trial. The fact that defense counsel did not adequately communicate with persons investigating on its behalf does not mean the information could not have been detected through reasonable diligence. Even if Pea did not give this specific information to the investigator, counsel was aware of inconsistencies between Pea's and Kimble's accounts but chose not to call Pea to testify. *See United States v. Time*, 21 F.3d 635, 642 (5th Cir. 1994) (finding that no new trial was warranted when defendant had reason to believe that witness possessed information but failed to cross-examine him at trial).

At any rate, it is highly unlikely that a new trial would produce an acquittal given the wealth of evidence of Richardson's violent acts and his status as a "reaper" and "enforcer" in the gang. The district court did not abuse its discretion in denying Richardson's motion for new trial.

## XI
## ALONZO BATES

Alonzo Bates argues that the government failed to show conspiracy-related activity after Bates reached the age of majority on May 6, 1994. Bates apparently challenges this court's jurisdiction under the Juvenile Delinquency Act ("JDA"), 18 U.S.C. § 5031 *et seq.* Interpretation of the JDA is a question of law, which we review *de novo*. Under the JDA, the Attorney General must

certify that "there is a substantial Federal interest in the case or the offense to warrant the exercise of Federal jurisdiction," and that one of three factors is satisfied before proceeding against any juvenile in federal court. 18 U.S.C. § 5032; *Tolliver*, 61 F.3d 1189, 1199. The JDA requirement is jurisdictional; therefore federal courts may not prosecute juveniles without certification. *Tolliver*, 61 F.3d at 1199.

Bates, however, is not a juvenile, and he is not being tried for acts completed before he turned eighteen. Although the crime of conspiracy is "complete" at the moment the deal is struck, it is a continuing crime that may extend from before a defendant's eighteenth birthday into his adult life. *Id*. at 1200. A federal court may try a defendant who has turned eighteen for a conspiracy that began before his eighteenth birthday if the government can show that the defendant ratified his involvement in the conspiracy after reaching majority. *Id*.

The jury convicted Bates of selling drugs to an undercover police officer August 26, 1994, several months after Bates's eighteenth birthday. The jury therefore could properly consider evidence of conspiracy activity before Bates reached the age of majority and convict him under count two of the drug conspiracy. *Tolliver*, 61 F.3d at 1200. To the extent Bates challenges the sufficiency of the evidence to support the August 26 drug charge, we find that a rational jury could have found him guilty on the

evidence presented at trial.

XII
SENTENCING CHALLENGES

Defendants raise various challenges to the application of the sentencing guidelines.  We review the district court's application of the Sentencing Guidelines *de novo*, and review the district court's factual findings for clear error, giving deference to the district court's application of the guidelines to the facts. *United States v. West*, 58 F.3d 133, 137 (5th Cir. 1995).

A

Richardson argues that the district court misapplied U.S.S.G. § § 3B1.1(a) by applying a four-level increase to the offense levels of both the VICAR group of offenses and the drug group of offenses.[9]  Richardson cites *United States v. Kleinebreil* for the proposition that this increase constitutes impermissible "double counting."  966 F.2d 945, 955 (5th Cir. 1992).

*Kleinebreil* is inapposite.  In that case, the defendant received a three-level increase to the offense level of his drug convictions based on his supervisory role in the drug conspiracy. Kleinebreil, however, also received a three-level increase to the offense level of his assault group of convictions, even though he was the only participant in the assault.  The court held that

_____

U.S.S.G. § 3B1.1(a) states: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."

-57-

because the section 3B1.1 enhancement must be anchored in the transaction leading to the conviction, the characteristics of one group of offenses could not be used to enhance the offense level of an unrelated group of offenses. *Id*. at 955.

Here, however, the government presented evidence that Richardson, along with Don Wilson and Alfred Brown, were leaders in both the VICAR conspiracy and the drug conspiracy, two distinct conspiracies to violate distinct criminal laws. The district court's fact findings were not clearly erroneous; the court properly applied the enhancement provision to both groups of offenses.

B

Alonzo Bates, Donald Miller, and Roderick Allen challenge the court's two-level enhancement for use of a firearm during drug trafficking activities under U.S.S.G. § § 2D1.1(b)(1) on the ground that the government did not adequately demonstrate that their possession of firearms was related to their sale of drugs. In addition, Bates asserts that application of the enhancement to him was unwarranted since the government did not seek this enhancement against all the other defendants. These arguments are completely without merit. Although a conviction on a substantive count requires proof beyond a reasonable doubt, the district court may sentence a defendant within the Sentencing Guidelines on any relevant evidence that "has sufficient indicia of reliability to

support its probable accuracy." U.S.S.G. § 1B1.3; *United States v. Buchanan*, 70 F.3d 818, 828 (5th Cir. 1995), *cert. denied*, ___ U.S. ___, 116 S. Ct. 1340, 134 L. Ed. 2d 490 (1996); *United States v. Edwards*, 65 F.3d 430, 432 (5th Cir. 1995). *Cf. United States v. Watts*, ___ U.S. ___, ___, 117 S. Ct. 633, 635, 136 L. Ed. 2d 554 (1997) (noting that Guidelines Manual section 1B1.3 charges sentencing court to consider "entire range of conduct" in sentencing defendant). The district court heard testimony during the sentencing hearing that Bates, Miller, and Allen carried guns and that guns were used by Bottoms Boys in relation to the drug trade. We find that this evidence has sufficient reliability for use by the district court in enhancing the sentences of the gang members.

Furthermore, even assuming that Bates's propensity to tote guns placed him on a par with other defendants, there is no requirement of parity in the sentencing enhancements of similarly situated defendants. The decision of whether to enhance a sentence is properly within the discretion of the district court judge. *Koon v. United States*, ___ U.S. ___, ___, 116 S. Ct. 2035, 135 L. Ed. 2d 392 (1996) (citing 18 U.S.C. § 3742). Finding no abuse of that discretion, we will not disturb the enhancement.

## XIII

Appellants raise numerous other issues that do not merit discussion in this opinion. Specifically, Alonzo Bates challenges

the trial court's finding that the government articulated race-neutral explanations for its peremptory strikes of certain African-American veniremen; Patrick Miller challenges the court's decision to allow the government to reopen its case before the close of trial to correct an evidentiary error; Reginald Wilson charges prosecutorial misconduct due to puffing in the government's opening statement; Roderick Allen challenges the specificity of the dates in the indictment and the court's refusal to decrease his offense level as a minor or minimal participant; Troy Bellamy challenges the constitutionality of the disparate penalty provisions for cocaine base (crack) versus cocaine powder; and Sebastian Richardson argues that ambiguity in the scope of the VICAR conspiracy alleged in the indictment prejudiced his ability to prepare a defense. After a careful review of the briefs and the evidence in the record, we find that these arguments are without merit under the established law of this circuit and affirm the district court without further discussion.

XIV

Therefore we VACATE Donald Wilson's conviction on count two; VACATE Reginald Wilson's convictions on counts nine and ten and Alfred Brown's conviction on count twenty-four and REMAND for new trial; VACATE Sebastian Richardson's and Alfred Brown's sentences on count one and REMAND for resentencing; REMAND the *Brady* challenge regarding the interview notes for further proceedings in

accordance with this opinion; and AFFIRM all other convictions in all respects.